*519 OPINION OF THE COURT
Shirley Werner Kornreich, J.
This action arises out of the collapse of two special purpose vehicles incorporated in the Cayman Islands, Blue Heron Funding VI, Ltd. and Blue Heron Funding VII, Ltd. (the SPCs), that were formed to invest in securities. Two corresponding companies, Blue Heron Funding VI Inc. and Blue Heron Funding VII, Inc., were incorporated in Delaware. Defendant WestLB AG, New York Branch (WestLB AG), a banking institution incorporated in Germany, served as the sponsor and asset manager of the SPCs, along with WestLB Asset Management LLC (WestLB AM) and Brightwater Capital Management LLC (BWC) (collectively, WestLB). Plaintiff Justinian Capital SPC (Justinian), as the current holder of two series of notes (the Class B Notes), one issued by each of the SPCs, brought suit against WestLB alleging the following causes of action: (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; (3) fraud; (4) fraudulent inducement; (5) breach of fiduciary duty; (6) negligence; (7) negligent misrepresentation; and (8) constructive trust/unjust enrichment. WestLB now moves to dismiss based upon documentary evidence, lack of legal capacity (standing and champerty) and failure to state a cause of action. (CPLR 3211 [1], [3], [7].) Plaintiff opposes. The motion is granted in part and denied in part for the reasons that follow.
I. Procedural History and Background
As discussed infra, the court declines to address the portions of the motion directed at substantive claims, due to the need for discovery on the champerty issue. Therefore, the court will not discuss the complex factual background surrounding the events leading up to the collapse of the SPCs. Instead, the court limits its discussion to the events surrounding Justinian’s involvement with the SPCs.
It also should be noted that at oral argument, held on May 5, 2011, the court requested that Justinian provide proof of ownership of the Class B Notes. In a letter dated May 12, 2011, Justinian supplied the court with the April 1, 2010 sale and purchase agreement (the SPA) between Deutsche Pfandbriefbank AG (DPAG) and Justinian that purported to show that “Justinian took all right, title and interest to the Class B Notes as of April 13, 2010.”
The complaint states “Justinian Capital SPC brings the action for and on behalf of the Blue Heron Segregated Portfolio *520 (‘Justinian’), by its attorneys, Reed Smith LLE”[1] (Complaint at 1.) It further states that “Justinian’s predecessors-in-interest invested” in the Class B Notes and explains that “Plaintiff’ shall include reference to these predecessors in interest and mean Class B Noteholders. (Id. at 1 n 2.) Justinian admits that it was not the original holder of the Class B Notes nor did it hold them at the time the alleged misconduct occurred. Instead, it contends it purchased them prior to the commencement of this suit, along with “all attendant rights, claims, and/or causes of action they possessed.” (Complaint II 33.) Neither in its complaint nor in the papers submitted in opposition to this motion does Justinian state the identity of the original Class B Noteholders.
The SPA identifies DPAG as the seller of the Class B Notes. The pertinent provisions of the SPA are as follows:
“3.1 The Seller hereby agrees to sell and the Purchaser hereby agrees to purchase the Assets on the Closing Date on the terms set forth below. [Elsewhere ‘the Assets’ are defined as the Class B Notes and ‘all the Seller’s legal, beneficial and equitable rights and claims for breach of contract, debt, tort, fraud or breach of fiduciary duty or wrong of whatever nature and under any applicable law against any Person arising now or in the future from its original acquisition or investment and subsequent retention or holding of the Notes or interests in the Notes.’]
“3.1.1 The Seller shall transfer and assign to the Purchaser full, complete and (subject to the terms of this Agreement) unencumbered title to the Assets by delivery of the Notes to the Custodian under the Custody Agreement.
“3.1.2 In consideration for the Seller’s transfer of the Assets, the Purchaser shall pay to the Seller in immediately available funds on the Base Price Due Date $1,000,000 comprised of (a) $500,000 in respect of the Assets comprised of the Blue Heron VI Notes and their respective Related Rights; and (b) $500,000 in respect of the Assets comprised of the Blue Heron VII Notes and their respective Related Rights . . .
“4.1 Upon the Closing Date: (a) the Seller shall be *521 deemed to have transferred and assigned to the Purchaser full, complete and (subject to the terms of this Agreement) unencumbered title to the Assets.” (Emphasis added.)
The term “Closing Date” is defined as “two (2) business days after the date this Agreement becomes effective pursuant to Section 26.” That section states that
“[t]his Agreement shall be effective upon execution and delivery of this Agreement by the parties hereto and delivery by Purchaser to Seller within 7 business days of the date of this Agreement of (i) a letter in the form of Schedule 1, executed by CIBC [the Custodian] and Purchaser, (ii) a letter in the form of Schedule 2, executed by counsel to Purchaser.”
The copy of the SPA submitted by plaintiff appears to be fully executed with signatures from both parties. Plaintiff also submitted the two letters referenced in section 26 and a statement from CIBC purporting to show that, as of January 31, 2011, it was holding the notes on behalf of Justinian. Finally, section 5.2 of the SPA provides for a “Purchase Price Adjustment” whereby Justinian will pay DPAG 80% or 85% (depending on when the purchase price is paid) of the net proceeds of any settlement or judgment with respect to the Class B Notes.
II. Discussion
On a motion to dismiss, the court must accept as true the facts alleged in the complaint as well as all reasonable inferences that may be gleaned from those facts. (Amaro v Gani Realty Corp., 60 AD3d 491 [2009]; Skillgames, LLC v Brody, 1 AD3d 247, 250 [1st Dept 2003], citing McGill v Parker, 179 AD2d 98, 105 [1992]; see also Cron v Hargro Fabrics, 91 NY2d 362, 366 [1998].) The court is not permitted to assess the merits of the complaint or any of its factual allegations, but may only determine if, assuming the truth of the facts alleged, the complaint states the elements of a legally cognizable cause of action. (Skillgames, 1 AD3d at 250, citing Guggenheimer v Ginzburg, 43 NY2d 268, 275 [1977].) Deficiencies in the complaint may be remedied by affidavits submitted by the plaintiff. (Amaro, 60 AD3d at 491.) “However, factual allegations that do not state a viable cause of action, that consist of bare legal conclusions, or that are inherently incredible or clearly contradicted by documentary evidence are not entitled to such consideration.” (Skillgames, 1 AD3d at 250, citing Caniglia v Chicago *522 Tribune-N.Y. News Syndicate, 204 AD2d 233 [1st Dept 1994].) Further, a motion to dismiss will succeed if “documentary evidence utterly refutes plaintiffs factual allegations, conclusively establishing a defense as a matter of law” (Goshen v Mutual Life Ins. Co. of N.Y., 98 NY2d 314, 326 [2002]; Leon v Martinez, 84 NY2d 83, 88 [1994]).
A. Defendant BWC
Justinian alleges that BWC is a limited liability company “incorporated under the laws of the State of New York” and “is a wholly-owned subsidiary of WestLB AG, and a division of WestAM.” (Complaint 1Í16.) Defendants claim that BWC is an unincorporated division of WestLB AM with no independent existence. (Mauhs affirmation 1Í1Í 2, 6.) Justinian’s only response is that “BWC held itself out to be a separate legal entity.” (Plaintiffs mem of law at 50.) Justinian does not allege any facts to suggest that WestLB AG or WestLB AM held BWC out to be an independent entity, as opposed to merely a division or a group of asset managers. All claims pleaded against BWC, therefore, are dismissed. (See Sheldon v Kimberly-Clark Corp., 111 AD2d 912 [2d Dept 1985] [unincorporated division of corporation not jural entity amenable to suit in own right].)
B. Standing and Champerty
As a threshold matter, defendants argue that Justinian does not actually own the Class B Notes and is not a proper party to this litigation. Alternatively, defendants argue that if Justinian actually owns the Class B Notes as a result of a valid purchase from the original noteholders, it purchased them solely to bring this litigation, a violation of New York’s law against champerty.
Standing
A defendant raising the affirmative defense of lack of standing in a motion to dismiss bears the burden of proof on the issue. (Brignoli v Balch, Hardy & Scheinman, 178 AD2d 290 [1st Dept 1991].) A defendant challenging standing must present facts sufficient to demonstrate the plaintiff is not the proper party in interest. (Matter of Blostein v Bauer, 218 AD2d 912, 913 [3d Dept 1995].)
The caption in this matter describes plaintiff as “Justinian Capital SPC, for and on behalf of Blue Heron Segregated Portfolio.” Plaintiff avers that Justinian is a segregated portfolio company formed pursuant to part XIV of the Companies Law of the Cayman Islands. (Lowe aff, dated July 29, 2011, 11 5.) Section 216 (1) of that statute states that
*523 “[a] segregated portfolio company may create one or more segregated portfolios in order to segregate the assets and liabilities of the company held within or on behalf of a portfolio from the assets and liabilities of the company held within or on behalf of any other segregated portfolio of the company or the assets and liabilities of the company which are not held within or on behalf of any segregated portfolio of the company.”
Section 216 (2) further states that “[a] segregated portfolio company shall be a single legal entity and any segregated portfolio of or within a segregated portfolio company shall not constitute a legal entity separate from the company.”
Moreover, section 218 (1) holds that
“[a]ny act, matter, deed, agreement, contract, instrument under seal or other instrument or arrangement which is to be binding on or to enure to the benefit of a segregated portfolio or portfolios shall be executed by or on behalf of the directors and on behalf of such segregated portfolio or portfolios which shall be identified or specified, and where in writing it shall be indicated that such execution is in the name of, or by, or for the account of, such segregated portfolio or portfolios.”
In order to be in compliance with these provisions, Justinian claims that in bringing this action, it must state that it is doing so “for and on behalf of’ the two segregated portfolios in which the notes are held. If both as a matter of New York and Cayman Islands law, Blue Heron Segregated Portfolio is part of Justinian and not a separate, legally distinct entity, then bringing this action “for and on behalf of Blue Heron Segregated Portfolio” appears to be a mere formality meant to comply with Cayman Islands law and has no bearing on Justinian’s standing because Justinian is really bringing this action on its own behalf. Defendants have not offered any concrete opposition to Justinian’s representations as to Cayman Islands law on this point. Consequently, dismissal on standing grounds is denied. Nonetheless, even if Justinian has standing to bring this action, its claims may be precluded on the ground of champerty.
Champerty
After tracing the roots of champerty, the Court of Appeals in Bluebird Partners v First Fid. Bank (94 NY2d 726, 734 [2000]) explained that “ ‘[c]hamperty’, as a term of art, grew out of *524 [the] practice . . . where someone bought an interest in a claim under litigation, agreeing to bear the expenses but also to share the benefits if the suit succeeded.” Champerty was developed “to prevent or curtail the commercialization of or trading in litigation.” (Id. at 729.) New York has adopted this prohibition in Judiciary Law §§ 488,[2] 489.
Judiciary Law § 489 (1) states that
“[n]o person or co-partnership, engaged directly or indirectly in the business of collection and adjustment of claims, and no corporation or association, directly or indirectly, itself or by or through its officers, agents or employees, shall solicit, buy or take an assignment of, or be in any manner interested in buying or taking an assignment of a bond, promissory note, bill of exchange, book debt, or other thing in action, or any claim or demand, with the intent and for the purpose of bringing an action or proceeding thereon.”
However, section 489 (2) provides the caveat that
“[e]xcept as set forth in subdivision three of this section [regarding indenture trustees], the provisions of subdivision one of this section shall not apply to any assignment, purchase or transfer hereafter made of one or more bonds, promissory notes, bills of exchange, book debts, or other things in action, or any claims or demands, if such assignment, purchase or transfer included bonds, promissory notes, bills of exchange and/or book debts, issued by or enforceable against the same obligor (whether or not also issued by or enforceable against any other obligors), having an aggregate purchase price of at least five hundred thousand dollars, in which event the exemption provided by this subdivision shall apply as well to all other items, including other things in action, claims and demands, included in such assignment, purchase or transfer (but only if such other items are issued by or enforceable against the same obligor, or relate to or arise in connection with such bonds, promissory notes, bills of exchange and/or book debts or the issuance thereof).” (Emphasis added.)
Bluebird Partners (id. at 735) explains that the champerty doctrine in New York has been limited to encompass not the *525 purchase of a claim with intent to bring suit but, rather, the purchase of a claim for the sole purpose of bringing suit. This is so because, as Bluebird Partners notes, the ancient prohibition of champerty must be reconciled with modern financial transactions. (Id. at 729.) Hence, “[t]o constitute the offense the primary purpose of the purchase must be to enable [the purchaser] to bring a suit, and the intent to bring a suit must not be merely incidental and contingent.” (Id. at 735.) In other words, the foundational intent to sue on the claim must have been the primary purpose for the transaction — with the intent and for the purpose of bringing the action. (Id. at 736; accord SB Schwartz & Co., Inc. v Levine, 82 AD3d 742, 743 [2d Dept 2011] [champerty forbids acquisition of claim for primary purpose of commencing lawsuit].) Thus, “if a party acquires a debt instrument for the purpose of enforcing it, that is not champerty simply because the party intends to do so by litigation” and, more generally, “the champerty statute does not apply when the purpose of an assignment is the collection of a legitimate claim.” (Trust for Certificate Holders of Merrill Lynch Mtge. Invs., Inc. Mtge. Pass-Through Certificates, Series 1999-C1 v Love Funding Corp., 13 NY3d 190, 200, 201 [2009].) Instead,
“[w]hat the statute prohibits ... ‘is the purchase of claims with the “intent and for the purpose of bringing an action” that [the purchaser] may involve parties in costs and annoyance, where such claims would not be prosecuted if not stirred up ... in [an] effort to secure costs.’ ” (Id. at 201, quoting Wightman v Catlin, 113 App Div 24, 28 [2d Dept 1906].)
In sum, New York draws a distinction “between one who acquires a right in order to make money from litigating it and one who acquires a right in order to enforce it.” (Id. at 200.) The latter motivation is permissible; the former is not. (Id.) Intent and purpose are usually questions of fact. (Bluebird Partners, 94 NY2d at 738.) As a result, New York’s champerty laws have traditionally been “limited in scope and largely directed toward preventing attorneys from filing suit merely as a vehicle for obtaining costs.” (Id. at 734, citing Elliott Assocs., L.P. v Banco de la Nacion, 194 F3d 363, 372-373 [2d Cir 1999].) Given these strictures, New York courts have rarely encountered a case in which the challenged conduct was found, as a matter of law, to constitute a violation of the statute. (Bluebird Partners, 94 NY2d at 734-735 [“(t)his Court’s jurisprudence demonstrates that while this Court has been willing to find that an action is *526 not champertous as a matter of law ... it has been hesitant to find that an action is champertous as a matter of law”] (citations omitted)].) This reluctance is warranted. The financial industry is critical to New York’s economy, and its courts are rightly wary of fomenting uncertainty in its vibrant secondary debt markets by exposing the purchasers of debt instruments to charges of champerty. (Bluebird Partners, 94 NY2d at 739 [“To say the least, a finding of champerty as a matter of law might engender uncertainties in the free market system in connection with untold numbers of sophisticated business transactions — a not insignificant potentiality in the State that harbors the financial capital of the world”].)
This is a particular concern in the market for high-risk distressed debt since it is the very nature of such instruments that they are likely, or even destined, to be defaulted on— thereby making litigation a near precondition to their enforcement. (Elliot Assocs., L.P., 194 F3d at 380.) Any investor purchasing them is probably doing so with the primary or sole intent of bringing an action. For this reason, it has been noted that an expansive reading of the statute’s reference to the buyer’s purpose would create a “perverse result” in regard to such claims. (Id. at 380-381.) Obligors on distressed instruments would be incentivized to preemptively and publicly pronounce an intent to default. Any purchaser would be vulnerable to a charge of champerty given that their purpose would necessarily be to bring a suit upon the instruments.
Here, defendants accuse Justinian of engaging in a scheme whereby it would appear to purchase the Class B Notes in order to convince the court that it is the proper party to pursue the claims alleged in its complaint, when, in fact, the SPA — irrespective of its enforceability — exists merely to hide the true nature of Justinian’s involvement: to bring the underlying claims as an illegal proxy, aided and abetted by its former attorney (Reed Smith), for the real parties in interest (the actual owners of the Class B Notes). The relevant inquiry is whether Justinian bought the instruments as a bona fide investment (which would properly include the ability to enforce rights through litigation) or if the purchase was merely pretext for conducting litigation by proxy in exchange for a fee. The latter is classic champerty. (See Faris v Longtop Fin. Tech. Ltd., 2011 WL 4597553, *7, 2011 US Dist LEXIS 112970, *23-25 [SD NY, Oct. 4, 2011, No. 11 Civ. 3658(SAS)], citing Trust for the Certificate Holders of Merrill Lynch Mtge. Invs. Inc., 13 NY3d at 200 *527 [court must determine whether debt instruments were acquired to enforce rights under them or “in order to make money from litigating”].)
Since defendants raise champerty as an affirmative defense, they bear the burden of proof in regard to it. (See Brignoli v Batch, Hardy & Scheinman, 178 AD2d 290 [1991].) Defendants have submitted a business presentation by Justinian in which it lays out its business model as follows: (1) purchase an investment that has suffered a major loss from a company so that the company does not need to report such loss on its balance sheet;[3] (2) commence litigation to recover the loss on the investment; (3) remit the recovery from such litigation to the company, minus a cut taken by Justinian; and (4) partner with specific law firms (such as Reed Smith) to conduct the litigation.
While allegations of champerty have been rejected in similar cases, this case appears to be unique. In fact, it appears that the court may be presented with a question of first impression: whether a company (Justinian) may partner with a law firm (Reed Smith) to purchase debt instruments where the primary motivation for doing so is to make money from the litigation. This court believes that the answer, under New York’s current statutory scheme, is no.
Documentary evidence submitted by Justinian suggests that it might be subject to the safe harbor created by section 489 (2). As discussed supra, Justinian purchased the Class B Notes through the SPA, pursuant to which it was to pay DPAG $500,000 plus 80% or 85% of the net proceeds of any settlement or judgment it secured. The safe harbor provision of section 489 (2) is unavailing to Justinian because if defendants’ allegations are true, the SPA is not really an agreement for the sale of the Class B Notes. If Justinian were really buying the Class B Notes, it would not be remitting the majority of their value back to the sellers. Alternatively, if Justinian were merely buying approximately 15-20% of the Class B Notes, it could not sue for 100% of the lost value caused by defendants — it would be limited to the value of its share. The sellers would be necessary parties to this action in order for a judgment to be entered in the *528 amount of the entire loss. Instead, the SPA may be an agreement whereby the owners of the Class B Notes are subcontracting out this litigation to Justinian. If this is so, the scheme would be prohibited by champerty. If the prohibition of champerty is no longer a viable policy given the realities of the modern financial and legal climate, it would be up to the legislature, not the court, to say so.
There are clearly questions of fact surrounding Justinian’s actual purpose and intent in purchasing the Class B Notes that require further discovery to resolve. (See Bluebird Partners, 94 NY2d at 738.) Therefore, the court directs the parties to conduct limited discovery on the issue of champerty, reserves judgment on the remainder of the motion, and stays all other discovery until this issue is resolved.
Accordingly, it is hereby ordered that all claims against defendant Brightwater Capital Management LLC are hereby dismissed; and it is further ordered that the parties are to appear in Part 54, Supreme Court, New York County, 60 Centre St., Room 228, New York, New York, for a status conference on August 28, 2012 at 10:00 in the forenoon, at which a limited discovery schedule will be issued and a date set for a hearing on whether this action should be dismissed on the ground of champerty; and it is further ordered that all discovery unrelated to the issue of champerty is hereby stayed.

. In an order dated May 18, 2011, this court disqualified Reed Smith as counsel for plaintiff.

. Judiciary Law § 488 applies to attorneys.

. Another added benefit would be that the company that suffered the loss could remain anonymous. However, the goal of anonymity cannot be realized in this case because the claims for fraud and fraudulent inducement require evidence of what the investors were told, what they knew, and whether their reliance was reasonable. Such evidence will necessarily involve the identification of the investors.