OPINION OF THE COURT
Shirley Werner Kornreich, J.
Defendants WestLB AG, New York Branch and WestLB Asset Management (US) LLC (collectively, WestLB) move for summary judgment and dismissal of the complaint on the ground of champerty. Defendants’ motion is granted for the reasons that follow.
I. Introduction
Champerty “developed hundreds of years ago to prevent or curtail the commercialization of or trading in litigation.” (Bluebird Partners v First Fid. Bank, 94 NY2d 726, 729 [2000].) The prohibition of champerty has been repealed by many states.[1]
New York, however, continues to recognize the doctrine under Judiciary Law § 489, which provides:
“No person . . . shall solicit, buy or take an assignment of, or be in any manner interested in buying or taking an assignment of a bond, promissory note, bill of exchange, book debt, or other thing in action, or any claim or demand, with the intent and for the *600 purpose of bringing an action or proceeding thereon.” (§ 489 [1] [emphasis added].)
When addressing distressed debt, the champerty inquiry turns on the difference “between one who acquires a right in order to make money from litigating it and one who acquires a right in order to enforce it.” (Trust for Certificate Holders of Merrill Lynch Mtge. Invs., Inc. Mtge. Pass-Through Certificates, Series 1999-C1 v Love Funding Corp., 13 NY3d 190, 200 [2009] [Love III) The latter is permissible; the former is not. (See Justinian Capital SPC v WestLB AG, N.Y. Branch, 37 Misc 3d 518, 525 [Sup Ct, NY County 2012] [Justinian 2].)
II. Background
In 2010, plaintiff Justinian Capital SPC (Justinian) commenced this action on behalf of an investment portfolio that was compromised by mortgage backed securities. These securities were allegedly included in the portfolio despite the fact that they did not meet the portfolio’s investment guidelines. Justinian sued WestLB, the portfolio’s investment manager, for breach of contract and for fraud WestLB allegedly employed in trying to cover up its misdeeds.
Justinian, however, never invested with WestLB. The subject notes were originally purchased by nonparty Deutsche Pfandbriefbank AG (DPAG). DPAG, like WestLB, is a German bank that suffered massive losses during the recent economic crisis due to exposure to the U.S. housing market. Since the crisis, DPAG has been heavily reliant on funding from the German government. This presented DPAG with a possible political and public relations conundrum with respect to its grievances against WestLB, which happens to be partially owned by the German government. DPAG did not sue WestLB, which might have imperiled its very existence if the German government took offense and decided to withhold funding. Rather, Justinian offered to sue WestLB and remit the litigation recovery to DPAG minus a 15% cut, which would serve as Justinian’s fee. DPAG is not a named plaintiff, and the details of the DPAG/Justinian arrangement were not fully disclosed at the outset of this case.
At oral argument on the original motion to dismiss, the champerty issue became apparent when the sale and purchase agreement between Justinian and DPAG (the SPA) was pro *601 duced. In an order dated August 15, 2012, the court declined to reach the merits of the motion to dismiss.[2] The parties were directed to conduct limited discovery on champerty. (See Justinian I, 37 Misc 3d at 528.)
After completion of such discovery, on September 18, 2013, WestLB moved for summary judgment and dismissal on the ground of champerty. Justinian opposed, arguing that the SPA is not champertous and, even if it is, the statutory safe harbor applies. Oral argument was held on January 16, 2014. For the reasons that follow, the court finds that the safe harbor does not apply and that the SPA is champertous.
III. The Safe Harbor
In 2004, instead of discarding the champerty doctrine, the legislature added a safe harbor provision to the champerty statute, Judiciary Law § 489 (2). The safe harbor precludes a champerty defense when the securities being sold, such as the subject notes, have “an aggregate purchase price of at least [$500,000].” The statute does not indicate whether such money must actually be paid. This is relevant to the subject notes because, though the SPA’s stated sale price is $1 million ($500,000 for each note), it is undisputed that Justinian, a shell company with no assets, did not pay the sale price nor does it have the means to do so. Moreover, Justinian’s failure to pay the sale price is not considered an event of default under the SPA. The parties, as a result, dispute whether the safe harbor applies where, as here, the buyer does not pay for the securities but merely lists a nominal purchase price of at least $500,000.
Justinian submitted persuasive evidence of section 489 (2)’s meaning: the affirmation of Susan V. John (John affirmation), a member of the New York State Assembly from 1991 to 2010. (See docket No. 158.) Ms. John was a member of the Judiciary Committee in 2004, when section 489 (2) was enacted. Her affirmation was originally submitted in a similar case, styled Bank Hapoalim B.M. v WestLB AG, N.Y. Branch (Sup Ct, NY County, Kornreich, J., index No. 603458/2009). In that case, which this court dismissed for reasons other than champerty,[3] the champerty inquiry was different because at least $900,000 was actually paid for the notes. (See John affirmation ¶ 11.) The *602 question raised was whether the price of each note must be $500,000, or if the aggregate price can add up to $500,000. Before addressing this issue, Ms. John noted that “[t]he Legislature intended to provide clear protection for transactions where a purchaser pays at least $500,000 in a single transaction or transactions for the assignment or transfer of financial instruments and causes of action.” (John affirmation ¶ 9 [emphasis added].) Then, with respect to the question of the price of each note, she explained:
“[n]or does the fact that Justinian paid certain sellers far less than $500,000—in some instances, only paying certain sellers $1,000—change my opinion. The term ‘having an aggregate purchase price of at least $500,000’ was intended to authorize such transfers as long as such transfers were part of a larger commercial transaction where the aggregate amount paid was $500,000.” (John affirmation ¶ 12 [emphasis added].)
Thus, according to Ms. John, section 489 (2) requires actual payment of the purchase price. Moreover, according to Ms. John, where there are multiple notes whose contract price is at least $500,000, the purchaser does not have to actually pay $500,000 for each note to avail itself of the safe harbor. Nonetheless, as Ms. John’s affirmation makes clear, the SPA cannot merely recite a nominal amount equal to the monetary threshold. Ergo, if the purchase price is not paid—such as here, where Justinian paid nothing—the safe harbor does not apply.
Ms. John’s understanding of the safe harbor is reinforced by the legislative history of the bill, which she sponsored. (See Bill Jacket, L 2004, ch 394.) The memorandum supporting the bill states that the safe harbor applies when the buyer “had paid, in the aggregate, at least five hundred thousand dollars ($500,000) in connection with transactions” (Assembly Mem in Support, Bill Jacket, L 2004, ch 394 at 4 [emphasis added]).
Indeed, requiring actual payment is necessary to avoid the safe harbor effectively doing away with champerty, a measure the legislature chose not to adopt. Clearly, the legislature could have eliminated champerty as a defense, as most other states have done. Instead, by adopting a safe harbor, the legislature made the explicit decision to maintain the prohibition. This court cannot adopt a reading of section 489 (2) that contravenes the legislative history and its policy decision. Accordingly, the court finds that the SPA is not covered by the safe harbor.
*603 IV Champerty
The court now turns to the question of whether the SPA is champertous.
In 2009, in Love III, the Court of Appeals had an opportunity to significantly narrow the scope of the champerty law’s application to the assignment of distressed debt, such as mortgage hacked securities. It did not.
The champerty issues in Love III arose in 2007, when a federal district court ruled that the assignment of an MLPA[4] governing commercial mortgage backed securities, made as part of a settlement of litigation involving that MLPA, was champertous because “the . . . purpose of the Assignment was to provide the [plaintiff] with the opportunity to . . . extract money from [defendant] by way of a lawsuit.” (See Trust for Certificate Holders of Merrill Lynch Mtge. Invs., Inc. Mtge. Pass-Through Certificates, Series 1999-C1 ex rel. Orix Capital Mkts., LLC v Love Funding Corp., 499 F Supp 2d 314, 325 [SD NY 2007, Scheindlin, J.] [Love I].) On appeal, the Second Circuit reviewed our state court precedents, finding them to be unclear. (See Trust for the Certificate Holders of the Merrill Lynch Mtge. Invs., Inc. Mtge. Pass-Through Certificates, Series 1999-C1, ex rel. Orix Capital Mkts., LLC v Love Funding Corp., 556 F3d 100, 110-114 [2d Cir 2009] [Love II.) The Second Circuit found there to be an open question about
“whether the intent to ‘buy a lawsuit’ . . . necessarily equates with the intent proscribed by [§ 489]. Specifically, would it make a difference whether the new lawsuit was purchased (a) to allow the purchaser to profit from the costs and fees that could be generated by that lawsuit, or, instead, (b) to provide a means to enforce an otherwise legitimate obligation.” (Id. at 111, quoting Love I, 499 F Supp 2d at 322.)
This distinction, however, is exceedingly difficult to draw in the secondary market for distressed debt.
For example, in the instant case, DPAG did not want to sue WestLB for political reasons. Yet, DPAG still wanted to recoup *604 the hundreds of millions of dollars it lost due to WestLB’s alleged fraud. Justinian, on the one hand, was hired to conduct litigation by proxy and, thereby, procure a fee; but, at the same time, the SPA is “a means to enforce an otherwise legitimate obligation.” {Id. at 111.)
To be sure, Justinian’s motive for entering into the SPA has nothing to do with sympathy for DPAG’s losses. Rather, Justinian is an opportunistic investor that identified inefficiencies in the market for financial crisis litigation and sought to capitalize on such inefficiencies through the SPA. If successful, Justinian would “profit from the costs and fees that could be generated by [DPAG’s] lawsuit.” {Id.) This is Justinian’s motive. Such motive is often used in mortgage backed securities litigation to induce the court to take claims less seriously because the “vulture fund,” as some would call Justinian, suffered no loss.
However, Justinian may be viewed as an important enforcer of the securities laws that seeks to hold those who caused the financial crisis accountable. If not for Justinian, many legitimate financial crisis lawsuits would simply not exist for reasons having nothing to do with their merits. Consequently, future bad actors would not be as deterred from repeating the financial misdeeds of the past. That being said, it is for the legislature, and not this court, to determine sound financial policy, an issue on which reasonable minds can surely disagree. This is especially the case when the prohibition on champerty only exists in this state by the will of the legislature.
As for the Court of Appeals, the Second Circuit in Love II certified the following three questions:
“1. Is it sufficient as a matter of law to find that a party accepted a challenged assignment with the ‘primary’ intent proscribed by [§ 489], or must there be a finding of ‘sole’ intent?
“2. As a matter of law, does a party commit champerty when it ‘buys a lawsuit’ that it could not otherwise have pursued if its purpose is thereby to collect damages for losses on a debt instrument in which it holds a pre-existing proprietary interest?
“3. (a) As a matter of law, does a party commit champerty when, as the holder of a defaulted debt obligation, it acquires the right to pursue a lawsuit against a third party in order to collect more damages through that litigation than it had demanded in settlement from the assignor?
*605 “(b) Is the answer to question 3(a) affected by the fact that the challenged assignment enabled the assignee to exercise the assignor’s indemnification rights for reasonable costs and attorneys’ fees?” (Love II, 556 F3d at 114.)
The Court of Appeals declined to answer the first question, explaining:
“We answer the second certified question, and both parts of the third certified question, in the negative. Because—as the Second Circuit itself hinted—‘the critical issue to assessing the sufficiency of the champerty finding is not the denomination of the Trust’s intent as “primary” or “sole,” but the purpose behind its acquisition of rights that allowed it to sue Love Funding’ . . . , we find it unnecessary to answer the first certified question.” (Love III, 13 NY3d at 198.)
The Court then went on to recount our state court precedent on the champerty doctrine, ranging from Baldwin v Latson (2 Barb Ch 306 [Ch Ct 1847]) to Bluebird (94 NY2d 726 [2000], supra), and the concern that the champerty doctrine foments uncertainty in financial markets. (See Justinian I, 37 Misc 3d at 526, citing Bluebird, 94 NY2d at 739 [“To say the least, a finding of champerty as a matter of law might engender uncertainties in the free market system in connection with untold numbers of sophisticated business transactions—a not insignificant potentiality in the State that harbors the financial capital of the world”].)
Ultimately, the Court of Appeals blessed the assignment in Love III because the plaintiff in that case had a preexisting financial interest in the MLPA by virtue of its role in the underlying transactions. (See Love III, 13 NY3d at 195 [“a corporation . . . that takes an assignment of a claim does not violate (§ 489 [1]) if its purpose is to collect damages, by means of a lawsuit, for losses on a debt instrument in which it holds a preexisting proprietary interest”] [emphasis added];[5] see also SB Schwartz & Co., Inc. v Levine, 82 AD3d 742, 743 [2d Dept 2011] *606 [assignment not champertous “if the party obtaining the claim or debt does so as part of a larger transaction and the intent to commence litigation is incidental to that larger transaction”] [emphasis added].) In effect, the Love III Court merely reaffirmed its holding in Bluebird, which permits the purchase of distressed debt for the purpose of enforcing such debt thorough litigation. In other words, if an investor buys worthless mortgage backed securities, it can sue the issuer for fraud and, if it wins, it can keep the money. Such a sale, according to the Court of Appeals, is not prohibited by section 489. Nonetheless, that is not the situation in the instant case because Justinian, a shell formed exclusively for the purposes of litigating the instant action, did not buy the subject notes. As this court previously observed:
“If Justinian were really buying the Class B Notes, it would not be remitting the majority of their value back to the sellers. Alternatively, if Justinian were merely buying approximately 15-20%* ****[6] of the Class B Notes, it could not sue for 100% of the lost value caused by defendants—it would be limited to the value of its share. The sellers would be necessary parties to this action in order for a judgment to be entered in the amount of the entire loss. Instead, the SPA may be an agreement whereby the owners of the Class B Notes are subcontracting out this litigation to Justinian. If this is so, the scheme would be prohibited by champerty.” (Justinian I, 37 Misc 3d at 527-528.)
The deposition testimony of Thomas Lowe, Justinian’s principal, and Thomas Glynn, DPAG’s CEO, substantiated the notion that the SPA “was merely pretext for conducting litiga *607 tion by proxy in exchange for a fee.” (Id. at 526.) Justinian paid nothing for the notes; 85% of any verdict or settlement goes back to DPAG; and, DPAG still effectively controls the notes— the notes are in a lockbox, DPAG has a perfected security interest in the notes, Justinian cannot sell the notes without DPAG’s consent, and there are significant restrictions on Justinian’s ability to settle this action or even change law firms without input from DPAG. Justinian, nonetheless, protests that it does, in fact, have real title to the notes, that the $1 million purchase price is an enforceable legal obligation, and—above all else—the court should take the SPA at face value (regardless if its terms do not reflect the economic reality of the transaction). Moreover, Justinian attempts to justify its 15% contingency fee by averring that the notes, whose only value is their potential for litigation recovery, are difficult to price, so the court should view its arrangement with DPAG as an “anti-embarrassment” clause (more common in non-U.S. transactions), designed to avoid underpricing the asset being sold. Justinian’s arguments are unpersuasive.
No reasonable finder of fact could conclude that Justinian was making a bona fide purchase of securities. The only reasonable way to understand the SPA is that DPAG was subcontracting out its litigation to Justinian for political reasons. To be sure, the court need not definitely resolve the question of whether there was some, remote possibility that DPAG might have had a change of heart and, had the SPA not been consummated, decided to sue before the statute of limitations was set to expire later that month. This speculative inquiry is a red herring since, as this court understands the discussed Court of Appeals precedent, it is not champerty to sue on behalf of debt that you buy for yourself, but it is champerty to sue, on behalf of another and for a fee, for debt that is not really your own. The latter is litigation by proxy and prohibited by section 489. If this is not champerty, then champerty no longer exists in New York State. Such a proclamation must come from the legislature, not the courts. Accordingly, it is ordered that the motion by defendants WestLB AG, New York Branch and WestLB Asset Management (US) LLC to dismiss the complaint on the ground of champerty is granted, and the clerk is directed to enter judgment dismissing the complaint with prejudice.

. See Jonathan T. Molot, Litigation Finance: A Market Solution to a Procedural Problem, 99 Geo LJ 65, 94 n 98 (2010), quoting Peter Charles Choharis, A Comprehensive Market Strategy for Tort Reform, 12 Yale J on Reg 435, 464 (1995) (“It is doubtful that the tort of champerty is available as a separate cause of action in any state, while prosecution of champerty as a criminal misdemeanor ended long ago”).

. The claims against defendant Brightwater Capital Management LLC were dismissed since Brightwater is merely an unincorporated division of WestLB. (See Justinian I, 37 Misc 3d at 522.)

. See index No. 603458/2009, docket No. 117.

. MLPA stands for “mortgage loan purchase agreement,” the contract which governs the sale of a pool of mortgages which later get deposited into a trust. The trust then issues certificates, the mortgage backed securities. (See generally Allstate Ins. Co. v Credit Suisse Sec. [USA] LLC, 42 Misc 3d 1220[A], 2014 NY Slip Op 50106[U], *2 [Sup Ct, NY County 2014]; Bank of N.Y. Mellon v WMC Mtge., LLC, 41 Misc 3d 1230[A], 2013 NY Slip Op 51934[U], *1 [Sup Ct, NY County 2013].)

. As the Second Circuit explained:
“The Trust was not, after all, a party with no interest in the loans that Love Funding had transferred to PaineWebber pursuant to the Love MLPA. To the contrary, as the end holder of the Arlington Loan, the Trust was the party that would directly suffer the damages of any default on that instrument. . . The Trust could not, however, sue Love Funding directly for damages linked *606 to Cyrus’s initial fraud for the simple reason that no privity existed between the Trust and Love Funding. Thus, the Trust first sued UBS and, then, by accepting in settlement an assignment of UBS’s rights in the Love MLPA, the Trust effectively acquired privity with Love Funding. It is in this sense that the Trust might be viewed, as the district court found, to have bought a ‘ “whole new lawsuit,” ’ [Love I], 499 F.Supp.2d at 322, i.e., a lawsuit that it could not have filed on its own—but hardly one involving a debt obligation that it had no interest in collecting.” (Love II, 556 F3d at 111-112 [emphasis added].)

. To be sure, had Justinian merely purchased 15% of the notes, and if it only sought recovery, for itself, for the value of its 15% there would be no champerty problem. But, since Justinian purports to have standing to recover for 100% of the notes, it cannot credibly contend that it has a stand-alone 15% interest.