OPINION OF THE COURT
Chief Judge DiFiore.
The concept of champerty dates back to French feudal times (Bluebird Partners v First Fid. Bank, 94 NY2d 726, 733-734 [2000]). In the English legal system, the word “champart” was used “as a metaphor to indicate a disapproval of lawsuits brought Tor part of the profits’ of the action” (id. at 734 [citations omitted]). As we have explained, the champerty doctrine was developed “to prevent or curtail the commercialization of or trading in litigation” (id. at 729). New York’s champerty doctrine is codified at Judiciary Law § 489 (1). As pertinent here, the statute prohibits the purchase of notes, securities, or other instruments or claims with the intent and for the primary purpose of bringing a lawsuit (see id. at 735-736).
Justinian Capital SPC, a Cayman Islands company, brings this action against WestLB AG, New York Branch and WestLB Asset Management (US) LLC (collectively, WestLB), alleging that WestLB’s fraud (among other malfeasance) in managing two investment vehicles caused a steep decline in the value of notes purchased by nonparty Deutsche Pfandbriefbank AG (DPAG). Justinian acquired the notes from DPAG days before it commenced this action.
In this appeal, we must first decide whether Justinian’s acquisition of the notes from DPAG is champertous as a matter *164 of law. If the answer is “yes,” we must then decide whether the acquisition falls within the champerty statute’s safe harbor provision codified at Judiciary Law § 489 (2). The safe harbor provides that the champerty doctrine of section 489 (1) is inapplicable when the notes or other securities are acquired for “an aggregate purchase price of at least five hundred thousand dollars” (Judiciary Law § 489 [2]).
As set forth below, we hold that Justinian’s acquisition of the notes was champertous and, further, that Justinian is not entitled to the protection of the safe harbor provision. Therefore, the order of the Appellate Division should be affirmed.
L
In 2003, nonparty DPAG invested close to €180 million (approximately $209 million) in notes (the notes) issued by two special purpose companies, Blue Heron Funding VI Ltd. and Blue Heron Funding VII Ltd. (collectively, the Blue Heron portfolios). The Blue Heron portfolios were sponsored and managed by defendants WestLB. By January 2008, the notes had lost much (if not all) of their value.
After the value of the notes declined, DPAG considered its options. In the summer of 2009, DPAG’s board of directors approved filing a direct lawsuit against WestLB. Both DPAG and WestLB are German banks and, at the time, DPAG was receiving substantial support from the German government and WestLB was partly owned by the government. Because of these relationships the DPAG board expressed concerns about pursuing a direct action to vindicate its rights for fear that the government would withdraw support from DPAG if it sued WestLB. This fear of repercussions from bringing a direct lawsuit led DPAG to consider another option in which a third party would bring the lawsuit and remit a portion of any proceeds to DPAG. In February 2010, DPAG discussed this option with plaintiff Justinian, a Cayman Islands shell company with few or no assets. A presentation submitted by Justinian in this action described Justinian’s business plan as:
“(1) purchase an investment that has suffered a major loss from a company so that the company does not need to report such loss on its balance sheet; (2) commence litigation to recover the loss on the investment; (3) remit the recovery from such litigation to the company, minus a cut taken by *165 Justinian; and (4) partner with specific law firms ... to conduct litigation.”
Ultimately, the DPAG board approved the option of having Justinian bring suit because it presented the “best risk return profile” for DPAG.
In April 2010, DPAG and Justinian entered into a sale and purchase agreement (the agreement). Pursuant to the agreement, DPAG would assign the notes to Justinian and Justinian would agree to pay DPAG a base purchase price of $1,000,000 (representing $500,000 for the Blue Heron Funding VI notes and $500,000 for the Blue Heron Funding VII notes). The notes were assigned to Justinian shortly after execution of the agreement. The assignment, however, was not contingent on Justinian’s payment of the $1,000,000. Nor did Justinian’s failure to pay the $1,000,000 constitute an event of default under section 9 of the agreement. According to Justinian’s principal and chief negotiator of the agreement, Thomas Lowe, Justinian’s failure to pay the $1,000,000 did not constitute a breach of the agreement. Under the terms of the agreement, the only consequences of Justinian’s failure to pay by the selected due date appear to be that interest would accrue on the $1,000,000 and that Justinian’s share of any proceeds recovered from the lawsuit would be reduced from 20% to 15%. Justinian has not paid any portion of the $1,000,000 base purchase price, and DPAG has not demanded payment.
Within days after the agreement was executed and shortly before the statute of limitations was to expire, Justinian filed a summons with notice in Supreme Court commencing this action against WestLB.[1] The subsequent complaint alleged causes of action in breach of contract, fraud, breach of fiduciary duty, negligence, negligent misrepresentation, and breach of the covenants of good faith and fair dealing, all in connection with WestLB’s alleged purchase of ineligible assets for the Blue Heron portfolios that caused the value of the notes to deteriorate.
WestLB moved to dismiss, alleging that Justinian lacked standing to bring this action. Justinian opposed the motion. In reply, WestLB raised the affirmative defense of champerty, arguing that Justinian’s acquisition of the notes was champer-tous under Judiciary Law § 489. After oral argument, Supreme *166 Court issued a written decision concluding that there were “questions of fact surrounding Justinian’s actual purpose and intent in purchasing the [notes] that require further discovery to resolve” (37 Misc 3d 518, 528 [Sup Ct, NY County 2012]). The court ordered discovery limited to the issues related to champerty and reserved judgment on the motion to dismiss.
After champerty-related discovery was complete, WestLB renewed its motion to dismiss, which Supreme Court treated as a motion for summary judgment. Supreme Court dismissed the complaint, concluding that the agreement was champertous because Justinian had not made a bona fide purchase of the notes and was, therefore, suing on a debt it did not own. Supreme Court also concluded that Justinian was not entitled to the protection of the champerty safe harbor of Judiciary Law § 489 (2) because Justinian had not made an actual payment of $500,000 or more (43 Misc 3d 598 [Sup Ct, NY County 2014]). On appeal, the Appellate Division affirmed, largely adopting the rationale of Supreme Court (128 AD3d 553 [1st Dept 2015]). This Court granted leave to appeal (25 NY3d 914 [2015]). We affirm, although our reasoning is somewhat different.
IL
Judiciary Law § 489 is New York’s champerty statute. Section 489 (1) restricts individuals and companies from purchasing or taking an assignment of notes or other securities “with the intent and for the purpose of bringing an action or proceeding thereon.”
In a prominent early champerty case, Moses v McDivitt (88 NY 62, 65 [1882]), we concluded that the language “with the intent and for the purpose” contained in a predecessor champerty statute[2]—language which Judiciary Law § 489 (1) has retained—was significant. We determined that simply intending to bring a lawsuit on a purchased security is not champerty, but when the purchase of a security was “made for the very purpose of bringing such suit” that is champerty because “this implies an exclusion of any other purpose” (88 NY at 65). Therefore, we held that “[t]o constitute the offense [of champerty] the primary purpose of the purchase must be to enable [one] to bring a suit, and the intent to bring a suit must not be merely incidental and contingent” {id. [emphasis *167 added]). The primary purpose test articulated in Moses has been echoed in our courts for well over a century. In Trust for Certificate Holders of Merrill Lynch Mtge. Invs., Inc. Mtge. Pass-Through Certificates, Series 1999-C1 v Love Funding Corp. (13 NY3d 190, 198-199 [2009]), we endorsed the distinction in Moses “between acquiring a thing in action in order to obtain costs and acquiring it in order to protect an independent right of the assignee” and opined that “the purpose behind [the plaintiffs] acquisition of rights” is the critical issue in assessing whether such acquisition is champertous. Similarly, in Bluebird Partners v First Fid. Bank (94 NY2d 726, 736 [2000]), we held that “in order to constitute champertous conduct in the acquisition of rights . . . the foundational intent to sue on that claim must at least have been the primary purpose for, if not the sole motivation behind, entering into the transaction.”[3]
Here, the impetus for the assignment of the notes to Justinian was DPAG’s desire to sue WestLB for causing the notes’ decline in value and not be named as the plaintiff in the lawsuit. Justinian’s business plan, in turn, was acquiring investments that suffered major losses in order to sue on them, and it did so here within days after it was assigned the notes. Contrary to the suggestion by the dissent, there was no evidence, even following completion of champerty-related discovery, that Justinian’s acquisition of the notes was for any purpose other than the lawsuit it commenced almost immediately after acquiring the notes (dissenting op at 172-173). Justinian’s principal speculated at his deposition as to other possible sources of recovery on the notes—for example, that *168 there “might have been” an insolvency or that there “might have been” a restructuring or distribution between the time of acquisition and 2047 when the notes were due. Such speculation does not suffice to defeat summary judgment. We have long held that “ ‘[m]ere conclusions, expressions of hope or unsubstantiated allegations or assertions are insufficient’ ” to defeat summary judgment (Gilbert Frank Corp. v Federal Ins. Co., 70 NY2d 966, 967 [1988], quoting Zuckerman v City of New York, 49 NY2d 557, 562 [1980]). Indeed, “[t]he moving party need not specifically disprove every remotely possible state of facts on which its opponent might win” to be entitled to summary judgment, particularly when the opponent’s “theorizing” is “farfetched” (Ferluckaj v Goldman Sachs & Co., 12 NY3d 316, 320 [2009]). Here, the lawsuit was not merely an incidental or secondary purpose of the assignment, but its very essence. Justinian’s sole purpose in acquiring the notes was to bring this action and hence, its acquisition was champertous.
III.
Conduct that is champertous under Judiciary Law § 489 (1) is nonetheless permissible if it falls within the safe harbor provision of Judiciary Law § 489 (2). Section 489 (2) exempts the purchase or assignment of notes or other securities from the restrictions of section 489 (1) when the notes or other securities “hav[e] an aggregate purchase price of at least five hundred thousand dollars” (Judiciary Law § 489 [2]). Here, although the price listed in the agreement, $1,000,000, satisfies the threshold dollar amount for the safe harbor, Justinian has not actually paid any portion of that price. Justinian argues that a binding obligation to pay is sufficient to receive the protection of the safe harbor. WestLB argues that in order to come within the safe harbor an actual payment of at least $500,000 must have been made. The courts below endorsed WestLB’s position. We do not agree. Actual payment of the purchase price need not have occurred to receive the protection of the safe harbor. Nonetheless, for the reasons set forth below, under the circumstances presented here, Justinian is not entitled to the protection of the safe harbor.
The parties disagree about whether the phrase “purchase price” in section 489 (2) is ambiguous. Justinian argues that it is unambiguous and means whatever amount is denominated the “purchase price” in a purchase agreement. WestLB argues that reading “purchase price” with “ ‘absolute literalness’ ” *169 would violate the safe harbor’s “ ‘purpose and intent’ ” (brief for defendants-respondents at 14, quoting Matter of Long v Adirondack Park Agency, 76 NY2d 416, 420 [1990]). We agree with that statement.
Although the phrase “purchase price” may be unambiguous in some contexts, here it is not, and we must look to the legislative history to discern its meaning (see Matter of Auerbach v Board of Educ. of City School Dist. of City of N.Y., 86 NY2d 198, 204 [1995]). A review of draft versions of the safe harbor legislation introduced during the legislative session reveals that at least one version of the bill contemplated that the safe harbor would protect a purchaser of notes or securities if either the aggregate face amount of the notes or securities sued upon totaled at least $1,000,000 or the purchaser had paid, in the aggregate, at least $500,000 to acquire them (2003 NY Senate Bill S2992-A). The statute as enacted contained different language, requiring instead that the notes or securities have “an aggregate purchase price” of at least $500,000 (Judiciary Law § 489 [2]). The “purchase price” language effectively falls between the two earlier proposed safe harbor formulations— strong indication that the legislature did not intend either that actual payment necessarily had to have been made or that face value alone would suffice to obtain the protection of the safe harbor.
The legislative explanation of the safe harbor’s purpose further supports our reading. New York has long been a leading commercial center, and our statutes and jurisprudence have, over many years, greatly enhanced New York’s leadership as the center of commercial litigation. The safe harbor was enacted to exempt large-scale commercial transactions in New York’s debt-trading markets from the champerty statute in order to facilitate the fluidity of transactions in these markets (see Assembly Mem in Support, Bill Jacket, L 2004, ch 394 at 4, 2004 NY Legis Ann at 282-283). The participants in commercial transactions and the debt markets are sophisticated investors who structure complex transactions. Requiring that an actual payment of at least $500,000 have been made for these transactions to fall within the safe harbor would be overly restrictive and hinder the legislative goal of market fluidity. The phrase “purchase price” in section 489 (2) is better understood as requiring a binding and bona fide obligation to pay $500,000 or more for notes or other securities, which is satisfied by actual payment of at least $500,000 or the transfer *170 of financial value worth at least $500,000 in exchange for the notes or other securities. Such understanding conforms with the realities of these markets in which payment obligations may be structured in various forms, whether by exchange of funds, forgiveness of a debt, a promissory note, or transfer of other collateral. We emphasize that we find no problem with parties structuring their agreements to meet the safe harbor’s requirements, so long as the $500,000 threshold is met, as set forth above.
However, as the dissent concedes, “[u]nquestionably, if the obligation to pay [at least $500,000] [i]s entirely contingent on a successful outcome in [the] litigation, it [does] not constitute a binding and bona fide debt” (dissenting op at 175). The legislative history reveals that a purchase price of at least $500,000 was selected because the legislature took comfort that buyers of claims would “not invest large sums of money” to pursue litigation unless the buyers believed in the value of their investments (see Assembly Mem in Support, Bill Jacket, L 2004, ch 394 at 4, 2004 NY Legis Ann at 283). This comfort is lost when a purchaser of notes or other securities structures an agreement to make payment of the purchase price contingent on a successful recovery in the lawsuit; such an arrangement permits purchasers to receive the protection of the safe harbor without bearing any risk or having any “skin in the game,” as the legislature intended. The legislature intended that those who benefit from the protections of the safe harbor have a binding and bona fide obligation to pay a purchase price of at least $500,000, irrespective of the outcome of the lawsuit.
That is precisely what is lacking here. The record establishes, and we conclude as a matter of law, that the $1,000,000 base purchase price listed in the agreement was not a binding and bona fide obligation to pay the purchase price other than from the proceeds of the lawsuit. The agreement was structured so that Justinian did not have to pay the purchase price unless the lawsuit was successful, in litigation or in settlement. The due date listed for the purchase price was artificial because failure to pay the purchase price by this date did not constitute a default or a breach of the agreement. The agreement permitted Justinian to exercise the option to let the due date pass without consequence and simply deduct the $1,000,000 (plus interest) from its share of any proceeds from the lawsuit.
In sum, we hold that because the notes were acquired for the sole purpose of bringing litigation, the acquisition was *171 champertous. Further, because Justinian did not pay the purchase price or have a binding and bona fide obligation to pay the purchase price of the notes independent of the successful outcome of the lawsuit, Justinian is not entitled to the protection of the safe harbor. In essence, the agreement at issue here was a sham transaction between the owner of a claim which did not want to bring it (DPAG) and an undercapitalized assignee which did not want to assume the $500,000 risk required to qualify for the safe harbor protection of section 489 (2) (Justinian).
Accordingly, the order of the Appellate Division should be affirmed, with costs.

. Brightwater Capital Management LLC was also named as a defendant, but was dismissed from the case by Supreme Court.

. 2 Rev Stat of NY, part III, ch III, tit II, art 3, § 71 at 228 (1st ed 1829).

. We reject Justinian’s contention that Judiciary Law § 489 has no application unless the underlying claim is frivolous or was brought by Justinian to secure “costs.” Justinian’s contention is based on certain language in Love Funding. However, nothing in Love Funding or any of our previous cases stands for the proposition that champerty turns on whether the underlying claim is frivolous, nor does Judiciary Law § 489 require the claim to be frivolous for the prohibition against champerty to apply. Indeed, we make no such finding as to the merits of this lawsuit. The reference in Love Funding to litigation being “ ‘stirred up ... in [an] effort to secure costs’ ” (Love Funding, 13 NY3d at 201, quoting Wightman v Catlin, 113 App Div 24, 28 [2d Dept 1906]) harks back to earlier cases, from before 1907, when “the prohibition of champerty was limited in scope and largely directed toward preventing attorneys from filing suit merely as a vehicle for obtaining costs, which, at the time, included attorneys’ fees” (Bluebird Partners, 94 NY2d at 734 [emphasis added]). Thus, the reference to champerty as a vehicle to obtain costs has no application to a company such as Justinian, which is not a law firm and would not obtain attorneys’ fees by virtue of bringing the lawsuit.