Tutor Perini Corp. v State Univ. Constr. Fund (2025 NY Slip Op 52062(U))

[*1]

Tutor Perini Corp. v State Univ. Constr. Fund

2025 NY Slip Op 52062(U)

Decided on December 1, 2025

Supreme Court, Albany County

Platkin, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on December 1, 2025
Supreme Court, Albany County

Tutor Perini Corporation, Plaintiff,

against
State University Construction Fund, Defendant. (And a Third-Party Action.)

Index No. 905916-20

Nida & Romyn, P.C.
Attorneys for Tutor Perini Corp.
(Robert Nida and Matthew J. Luce, of counsel)
12121 Wilshire Blvd., Suite 1100
Los Angeles, California 90025
Hinckley Allen & Snyder, LLP 
Local Attorneys for Tutor Perini Corp.
(James J. Barriere and Chad J. Caplan, of counsel)
30 South Pearl Street, Suite 1101
Albany, New York 12207
Letitia James, Attorney General
Attorney for State University Construction Fund 
(Richard C. Maider and Ryan L. Abel, of counsel)
The Capitol
Albany, New York 12224

Richard M. Platkin, J.

This is a commercial construction action brought by plaintiff Tutor Perini Corp. ("TPC"), [*2]a general contractor, against defendant State University Construction Fund ("Fund" or "SUCF"). Discovery is complete, and the Fund now moves to dismiss TPC's claims for delay damages.
I. BACKGROUND
A. The Parties and the Project
On or about August 30, 2012, the Fund and TPC entered into a $73 million contract by which TPC was engaged to construct the project commonly referred to as the New Academic Building, School of Public Health, State University of New York Science Center at Brooklyn, New York ("Project") (see NYSCEF Doc No. 434 ["R-SOMF"], ¶ 1; see also NYSCEF Doc No. 132 ["Contract"] at A-18).
"The Project included the construction of the New Academic Building ('NAB'), a new 8-story, 118,825 square floor building with classrooms, exam rooms, universal patient rooms, debriefing rooms, offices, and laboratories" (R-SOMF, ¶ 3). "The Project also included a limited renovation, 6,536 square feet of the adjacent Basic Science Building ('BSB')" (id., ¶ 4).
"SUCF retained Ennead Architects LLP ('Ennead' or 'Architect'), as the Consultant on the Project, to provide architectural and related services" (id., ¶ 5). Gilbane Building Corporation ("Gilbane") was retained to serve as construction manager (see id., ¶ 6).
"TPC was issued a Notice to Proceed on the Project on or about September 20, 2012" (id., ¶ 10), and the Contract called for substantial completion in 810 days (i.e., by December 10, 2014) (see Contract at A-1). The Fund granted TPC one extension of 121 days for various initial delays from September 2012 through April 2013, which extended the substantial completion date to April 10, 2015 (see NYSCEF Doc No. 131 ["Feltman Aff."], ¶ 12). 
However, for reasons upon which the parties disagree, the Project was not substantially completed until February 28, 2018, a delay of 1,176 days (see id., ¶ 13).
B. The Litigation
TPC commenced this action on September 14, 2020, seeking to recover about $23.5 million in damages for the Fund's alleged breaches of the Contract, primarily in the form of delay damages (see NYSCEF Doc No. 6 ["Complaint"], ¶¶ 1, 27). The Fund responded with counterclaims for liquidated delay damages of around $5 million (see NYSCEF Doc No. 7).
In October 2021, the Fund filed a third-party action against Ennead, seeking indemnity for any delay damages owed to TPC arising from design defects (see NYSCEF Doc No. 24). Ennead counterclaimed to recover $90,000 for unpaid work (see NYSCEF Doc No. 30).
In May 2022, Delphi Plumbing & Heating, Inc. ("Delphi"), a TPC subcontractor, moved to intervene as a party-plaintiff (see NYSCEF Doc No. 35). The motion was resolved through a stipulation accepting Delphi's proposed pleading as filed (see NYSCEF Doc Nos. 46, 50), which alleges direct claims against the Fund for delay damages, among other things, and a cross claim against TPC under an account-stated theory.
Extensive fact and expert discovery ensued, and a trial-term note of issue was filed on January 10, 2025 (see NYSCEF Doc No. 127). The Fund then filed the instant motion seeking dismissal of TPC's claims for delay damages (see NYSCEF Doc No. 130); Ennead moved for summary judgment dismissing the Fund's third-party complaint (see NYSCEF Doc No. 214); and Delphi moved for partial summary judgment on its intervenor complaint (see NYSCEF Doc No. 277).
Oral argument on the Fund's motion was held on September 12, 2025, the argument transcript was filed on October 6, 2025, and this Decision & Order follows.[FN1]

II. LEGAL STANDARDS
A. Summary Judgment
The movant for summary judgment "has the burden to establish a prima facie showing of entitlement to judgment as a matter of law" by "tendering sufficient evidence to demonstrate the absence of material issues of fact" (Voss v Netherlands Ins. Co., 22 NY3d 728, 734 [2014] [internal quotation marks and citation omitted]). The failure to make such showing "requires a denial of the motion, regardless of the sufficiency of the opposing papers" (Alvarez v Prospect Hosp., 68 NY2d 320, 324 [1986]).
But if the movant has made the requisite showing, the burden shifts to the party opposing the motion to demonstrate, by admissible proof, the existence of a triable issue of fact (see Zuckerman v City of New York, 49 NY2d 557, 562 [1980]). All evidence must be viewed in the light most favorable to the opponent of summary judgment (see Vega v Restani Constr. Corp., 18 NY3d 499, 503 [2012]). However, "[m]ere conclusions, expressions of hope or unsubstantiated allegations or assertions are insufficient to defeat summary judgment" (Justinian Capital SPC v WestLB AG, 28 NY3d 160, 168 [2016] [internal quotation marks and citations omitted]).
B. No-Damages-for-Delay Clauses
"As a general rule, 'contract clauses exculpating the contractee from liability to the contractor for damages resulting from delays in performance of the contract work' are valid and enforceable" (Tougher Indus., Inc. v Dormitory Auth. of the State of NY, 130 AD3d 1393, 1393 [3d Dept 2015], quoting Harrison & Burrowes Bridge Constructors, Inc. v State of New York, 42 AD3d 779, 782 [3d Dept 2007]). 
A no-damages-for-delay ("NDD") clause will not be enforced, however, to preclude a contractor's recovery of damages for: "(1) delays caused by the contractee's bad faith or its willful, malicious, or grossly negligent conduct, (2) uncontemplated delays, (3) delays so unreasonable that they constitute an intentional abandonment of the contract by the contractee, and (4) delays resulting from the contractee's breach of a fundamental obligation of the contract" (Corinno Civetta Constr. Corp. v City of New York, 67 NY2d 297, 309 [1986]). 
Here, the Contract includes a valid NDD clause incorporating the four recognized common-law exceptions (see Contract, § 3.05 [7]).
Where delay damages are not barred by an enforceable NDD clause, a contractor seeking to recover such damages has the burden of establishing that (1) the contractee was "responsible for the delay[s]"; (2) the "delays caused delay in completion of the contract (eliminating [*3]overlapping or duplication of delays)"; and (3) the contractor "suffered damages as a result of these delays" (Plato Gen. Constr. Corp./EMCO Tech Constr. Corp., JV, LLC v Dormitory Auth. of State of NY, 89 AD3d 819, 825 [2d Dept 2011] [internal quotation marks and citation omitted], lv denied 19 NY3d 803 [2012]).
As the movant for summary judgment, the Fund has the initial burden to establish that none of the exceptions to enforcement of the NDD clause are present (see Framan Mech., Inc. v State Univ. Constr. Fund, 182 AD3d 947, 950 [3d Dept 2020]). If the Fund meets its initial burden, it becomes TPC's burden to demonstrate the existence of legal defenses or material issues of disputed fact bearing on enforceability (see Tougher Indus., 130 AD3d at 1396; see also Zuckerman, 49 NY2d at 562).
III. THE FUND'S MOTION
The Fund moves "for an order, pursuant to CPLR 3212 (b) and (e), dismissing all of [TPC's] claims for additional delay compensation ($22,068,219.00) set forth in the . . . Complaint" (NYSCEF Doc No. 130).
A. Uncontemplated Delays
In its moving papers, the Fund principally argues that all of the delays and hinderances for which TPC seeks damages were contemplated by the Contract Documents (see NYSCEF Doc No. 212 ["MOL"] at 6-15).[FN2]

1. Legal Principles
Delays will not be "considered uncontemplated when they are 'reasonably foreseeable, arise from the contractor's work during performance, or . . . are mentioned in the contract'" (Bovis Lend Lease [LMB], Inc. v Lower Manhattan Dev. Corp., 108 AD3d 135, 147 [1st Dept 2013], quoting Corinno, 67 NY2d at 310; see Peckham Rd. Co. v State of New York, 32 AD2d 139, 141 [3d Dept 1969], affd 28 NY2d 734 [1971]). This is true even where the specific delays "may not have been anticipated," but "the possibility, however unlikely, of their arising was contemplated" (Blau Mech. Corp. v City of New York, 158 AD2d 373, 375 [1st Dept 1990] [internal quotation marks and citation omitted]).
Delays resulting from lack of coordination and maladministration are within the contemplation of a general contractor on a large construction project (see Weydman Elec., Inc. v Joint Schs. Constr. Bd., 140 AD3d 1605, 1607 [4th Dept 2016] ["dysfunctional and poorly managed" project], lv dismissed 28 NY3d 1024 [2016]; Commercial Elec. Contrs., Inc. v Pavarini Constr. Co., Inc., 50 AD3d 316, 318 [1st Dept 2008] ["inept administration (and) poor planning"]; Gottlieb Cont. v City of New York, 86 AD2d 588, 589 [1st Dept 1982] ["failure to . . . supervise and co-ordinate the project properly"], affd 58 NY2d 1051 [1983]).
The same is true of "design defects," which fall "'precisely within the contemplation of the exculpatory clauses'" (LoDuca Assoc., Inc. v PMS Constr. Mgt. Corp., 91 AD3d 485, 485-[*4]486 [1st Dept 2012], quoting Gottlieb, 86 AD2d at 589; see Kalisch-Jarcho, Inc. v City of New York, 58 NY2d 377, 385 [1983]; Tougher Indus., 130 AD3d at 1395).
2. Alleged Periods of Compensable Delay
According to TPC's delay expert, Carl LaFraugh, P.E., substantial completion of the Project "was delayed 1176 days from December 10, 2014 to February 28, 2018," with SUCF recognizing responsibility for 121 days in Owner Change Order ("OCO") #2 (NYSCEF Doc No. 205 ["LaFraugh Report"] at 4; see NYSCEF Doc No. 133 ["OCO #2"]). LaFraugh finds that "32 days of the 1176 days are excusable and not compensable from [SUCF], leaving 1144 days as days of delay potentially compensable" (LaFraugh Report at 4).
LaFraugh identifies nine periods of delay for which TPC seeks compensation:[FN3]

1. OCO #2 / Delays Prior to April 29, 2013 (121 days);
2. Bulletin 1 — Con Ed Vault Changes (0 days);
3. Structural Steel Revisions (54 days);
4. Basement Conduit Routing (62 days);
5. Building Enclosure Delays (115 days);
6. Switchboard Submittal Changes (87 days);
7. BSB Lobby Access Delays (171 days);
8. BSB Renovation Delays (404 days); and
9. Rolling Completion List, Inspections, Commissioning and Training Delays (162 days).
For purposes of its contemplation analysis, the Fund groups these periods into three general categories: (i) delays from defective designs; (ii) delays from extra work directed via change orders and field orders; and (iii) delays from the Fund's alleged maladministration of the Project.
3. Design Deficiencies
Certain of the delays claimed by TPC are said to arise from allegations of "defective, incomplete and/or faulty design documents which required revisions and/or corrections" (MOL at 8). According to the Fund, these "design claims primarily pertain to the structural steel, switchboard and the fiber cement panels" (id.). The Fund "denies that the design documents were flawed or deficient," but submits that "the design modifications were not uncontemplated and were addressed through the shop drawing process" (id.).
The Fund cites contractual language obliging TPC, "with such promptness and in such sequence as to cause no delay in the work," to submit for Ennead's "approval all Shop Drawings" (Contract, § 2.19 [1]). "Shop Drawings shall establish the actual detail of the work, indicate proper relation to adjoining work, amplify design details of mechanical and electrical equipment in proper relation to physical spaces in the structure, and incorporate minor changes of design or construction to suit actual conditions" (id. [2]). 
TPC was obliged to "thoroughly check" Shop Drawings before submitting them to [*5]Ennead, including the duty to "verify all dimensions and field conditions and . . . check and coordinate the Shop Drawings of any section or trade with the requirements of all other sections or trades whose work is related thereto, as required for proper and complete installation of the work" (id. [3]). The Fund contends that "the shop drawing process worked as envisioned, and the design issues were addressed as they arose on the Project" (MOL at 8).
a. Structural Steel Revisions
TPC sues to recover for delays attendant to "seventeen (17) months of steel design revisions, from October 2012 to March 2014, which led to revisions being issued while steel erection was already underway" (Complaint, ¶ 8). "Subsequent to the [revision] bulletins, shop drawings and fabrications were necessary. Consequently, the late bulletins delayed the completion of the steel erection and fabrication considerably" (id.). 
According to the Fund, the Contract contemplated that TPC's questions and concerns regarding steel fabrication would be addressed through the shop drawing process, as provided in Section 2.19 of the Contract and the Project specifications (see Feltman Aff., ¶¶ 50-57; see also NYSCEF Doc No. 140 at 5-10). The Fund thus argues that any delays attendant to "the review, revision and approval of the structural steel design drawings were contemplated" (id., ¶ 58).[FN4]

b. Switchboard
TPC claims that in June 2013, Ennead and its subconsultants allegedly "directed design changes to the switchboard through their submittal comments rather than the proper format of issuing a bulletin," and, as a result, "did not fully consider the impact of the directed changes" (Complaint, ¶ 9). "When the switchboard was delivered and ready to be installed nineteen (19) months later, it was discovered that the . . . changes had increased the width of the switchboard such that the equipment pad originally designed by the Architect was insufficient" (id.). Ennead "refused to acknowledge its failure to properly design the switchboard until a meeting five months later in July of 2015," and "the switchboard was not approved with the necessary corrections until September of 2015, twenty-seven (27) months after the changes were directed and seven months after the problems with these changes were initially raised to [Ennead]" (id.).
The Fund argues that these delays arose "when TPC's subcontractor Tru-Val Electric Corporation ('Tru-Val') redesigned the switchgear and Eaton Corporation ('Eaton') delivered the improperly configured switchgear to the site" (MOL at 8). "[T]he switchgear that was ordered and delivered by Tru-Val failed to incorporate Ennead's [coordination] notation" (Feltman Aff., ¶ 60).
The Fund further observes that the Contract obliged TPC to provide a fully-engineered [*6]switchboard system (see id., ¶ 61) and required the submission of design details, including "physical dimensions and weights, elevations, plan views, schematic diagram, buswork details, nameplate data, voltage, current, and short circuit ratings, materials, bus capacity data, circuit schedule, connector details, factory test reports, installation details, etc." (NYSCEF Doc No. 142 at 2; see Feltman Aff., ¶ 62). Additionally, the Project specifications placed ultimate "responsibility for initial access . . . and proper fit . . . with [TPC]" (NYSCEF Doc No. 143 at 15) and cautioned TPC to "[c]arefully check space" to ensure "that all material can be installed in the spaces allotted" (id. at 16; see also Feltman Aff., ¶ 67 [identification by Ennead of "possible spacing concerns" in Tru-Val's final shop drawing submittal]).
The Fund therefore submits that "TPC, Eaton, SUCF and Ennead, through the shop drawing process, worked together to address and make the corrections needed to accommodate the bottom feed connections and required access to the switchboard" (Feltman Aff., ¶ 66).
c. Building Enclosure Delays
TPC alleges that "its second revision of its fiber cement panel submittal . . . should have been near final as the Architect's comments had already been received and addressed," but Ennead "failed to timely review the submittal" and then "imposed a design change that was inconsistent with the contract documents" (Complaint, ¶ 12). "Further, the Architect imposed additional aesthetic changes to fastener locations" (id.). 
Again, the Fund observes that the Contract Documents obliged TPC to furnish all labor, materials, equipment and services necessary to provide a fully engineered fiber-cement panel system and identified a specific manufacturer, Cladding, Corp. ("Cladding") (see NYSCEF Doc No. 152 at 5). 
Accordingly, a TPC subcontractor retained Cladding to manufacture the panels (see Feltman Aff., ¶ 80). "In reviewing the shop drawings, Cladding and its engineers identified a wind zone pressure issue at the very high corners near the top of the building and recommended that additional fasteners be added to the design" (id., ¶ 81). TPC submitted a proposal on October 20, 2014 to adopt the revised pattern recommended by Cladding, and Ennead approved the revised pattern one week later (see id., ¶ 82). 
The Fund therefore contends that the fiber system was part of the Project, and design revisions to the drawings were contemplated by the Contract Documents (see id., ¶ 83).
4. Extra Work
The second category of contemplated delays identified by the Fund involves extra work directed through change orders and field orders (see MOL at 10).
a. Change Orders
Under the Contract, the Fund had the "right at any time during the progress of the work to add, modify or change the work covered by the Contract by a Change order thereto providing for extra work . . . [,] and in such event the Contract consideration shall be increased by an amount to be determined in accordance with the provisions of Section 4.02" (Contract, § 2.05 [1]). 
"Unless otherwise specifically provided for in a Change order, the compensation specified therein for extra work includes full payment for both the extra work . . . and for any delays to other work" caused by the extra work (id., § 4.02 [4]).
The Fund's moving papers cite the issuance of Change Orders associated with, among other things:
• Basement Conduit Routing. OCO #23 provided TPC with an additional $152,475 for installing an "enhanced electrical power feed from the [BSB]" (NYSCEF Doc No. 151) following Ennead's revision and clarification of Bulletin No. 66R1 (see NYSCEF Doc No. 148). TPC "reserve[d] all rights" to claim additional compensation (NYSCEF Doc No. 151).
• BSB Renovation Delays. OCO #38 provided $54,774 for new terrazzo at the BSB lobby stairs, as per Bulletin #126, with a reservation of rights (see NYSCEF Doc No. 180). OCO #36 was a deduct change order that compensated TPC for changes in "the design of the BSB Lobby" that left "in place an existing CMU wall" (Feltman Aff., ¶ 127; see NYSCEF Doc No. 170 [Bulletin #134]). TPC received the $3,614 credit but reserved its rights to claim a scheduling impact (see NYSCEF Doc No. 171). And OCO 58 (addition of $7,039) was issued in response to Bulletin #132, which made some changes to the millwork design and stainless steel trim in the BSB, for which TPC again reserved its rights (see NYSCEF Doc Nos. 186-187).
b. Field Orders
Section 4.05A of the Contract addresses field orders. Where the contract "contains a Field Order Allowance," the amount specified "shall cover the cost of additional labor and materials for contingent activities within the scope of the [Contract] as directed and described by the Fund in writing in a Field Order," with the "value of the work directed . . . [to] be determined by one or more of the provisions of Section 4.02" (Contract, § 4.05A). 
Here, the Contract established a field order allowance of almost $4 million (see id. at A-42), and the Fund issued field orders ("FOs") during the work for such diverse items as:
• OCO #2 / Early Delays. FOs #1-5, 7-9 and 14 involved extra site work that gave rise to the certain of the delays covered by OCO #2 (see Feltman Aff., ¶¶ 27-29; see also NYSCEF Doc No. 135), with TPC's direct costs settled by OCO #8 and various FOs (see Feltman Aff., ¶¶ 28, 34). In addition, FO #11 involved exploratory excavation to verify the location of a water main for which TPC was compensated its direct costs (see id., ¶ 48; NYSCEF Doc No. 139).[FN5]
• BSB Lobby Access. FO #86 compensated TPC for retaining a specialty mover to relocate a sculpture and glass wall in the lobby and return them upon completion of the work (see Feltman Aff., ¶¶ 84-89).
• BSB Renovation Delays. Various FOs were issued concerning fire suppression [*7]modification, a second fire control panel, additional fire stopping, reinforcement of the structural support for limestone panels, and additional support for the terrazzo.[FN6]
Given that the Contract expressly contemplated the issuance of change and field orders for extra work, any delays resulting from such orders are deemed "contemplated" (Plato, 89 AD3d at 824; see Blue Water Envtl., Inc. v Incorporated Vil. of Bayville, NY, 44 AD3d 807, 810 [2d Dept 2007], lv denied 10 NY3d 713 [2008]; Commercial Elec., 50 AD3d at 318).
5. Maladministration
TPC alleges that the Fund and its agents failed to properly administer (i) the Rolling Completion List ("RCL") and final inspection process, (ii) the commissioning process and (iii) the process of training Campus personnel (see Complaint, ¶¶ 15-16; MOL at 11).
a. RCL/Inspections
TPC alleges that the inspection process was maladministered, claiming that the Fund caused as many as 16 inspections per level of the NAB (see Complaint, ¶¶ 15, 16 [b]). 
The Fund responds by pointing to language from the Contract making "[a]ll materials and workmanship . . . subject to inspection, examination and testing by [Ennead] and the Fund at all times during the performance of the work and at all places where the work is carried on" (Contract, § 2.17 [1] [emphasis added]; see also id., § 2.23 [2]).
The Fund explains that it "tracked non-conforming, deficient, and incomplete work" on [*8]the RCL, with items "added or removed . . . after a walkthrough or inspection" (Feltman Aff., ¶ 170). "In mid-to-late 2017 the RCL was converted into a final inspection list (the 'Punch List')" (id.). Multiple inspections were largely occasioned by: (i) incomplete or defective work by TPC's subcontractors; (ii) difficulties in coordinating the return of TPC's subcontractors to address open items; and (iii) subcontractors intentionally concealing non-conforming work (see id., ¶ 171; see also NYSCEF Doc No. 189 at 3-4). The Fund attests that these issues continued through the conclusion of the Project in February 2018 (see Feltman Aff., ¶ 172). 
b. Commissioning
TPC alleges that the Fund's commissioning agent, Genesys, maladministered the process, dragging out a four-month process to 13 months (see Complaint, ¶ 16 [a]; Feltman Aff., ¶¶ 176-178).
The specifications for the Project address the general commissioning process, including coordination, work responsibilities and testing (see Feltman Aff., ¶ 179; see also NYSCEF Doc No. 190). In addition, the specifications include various system-specific commissioning requirements (see e.g. NYSCEF Doc Nos. 191-192).
Specification 019113 calls for the assembly of a Commissioning Team comprised of representatives of Genesys, the Fund, the Campus, Gilbane, Ennead, TPC and certain trades (see NYSCEF Doc No. 190 at 5). Genesys' primary role was "to develop and coordinate the execution of the Commissioning Plan [and] observe and document system performance," so as to ensure "that systems are functioning in accordance with the documented design intent and in accordance with the Contract Documents" (id. at 7; see Feltman Aff., ¶ 182).
But "TPC also played a central role in the process, including attending all meetings, furnishing all necessary documents to Genesys, providing readiness notifications, participating in pre-functional inspections, review of test procedures and progress reports [and] the coordination of resolution of equipment deficiencies and training" (Feltman Aff., ¶ 183; see NYSCEF Doc No. 190 at 9-10).
The Fund therefore contends that commissioning is addressed in the Contract Documents and, insofar as the process was delayed due to lack of coordination among the various participants, the delay was contemplated (see Feltman Aff., ¶ 184).
c. Training
Finally, TPC complains that the Fund maladministered the training process through "unresponsiveness, lack of Owner availability and unreasonable demands for rescheduling" (Complaint, ¶ 16 [c]). Training "was supposed to take four months," but "actually took 11 months to complete" (id.).
Specification 019113 made TPC responsible for the training of Campus personnel and "for ultimately ensuring that training is completed" (NYSCEF Doc No. 190 at 17). Gilbane advised TPC on July 13, 2017 that Campus personnel were available for training only on certain days of the week, with the expectation that unavailable staff would watch a recorded video (see Feltman Aff., ¶ 189; NYSCEF Doc No. 192). However, TPC did not record the sessions, even though the Contract Documents expressly provided for that (see NYSCEF Doc No. 193 at 3-4).
The Fund therefore asserts that training is addressed in the Contract Documents and to the extent that Campus personnel were unavailable, it was contemplated that TPC would record the training sessions for later viewing (see Feltman Aff., ¶ 191), and, in any event, maladministration is a contemplated risk assumed by TPC (see id., ¶ 192). 
6. Conclusion
Based on the foregoing, the Court concludes that the Fund has met its initial burden of demonstrating that the delays and disruptions complained of by TPC "were contemplated [and addressed] by the parties when they entered into" the Contract (Blau Mech., 158 AD2d at 374).
B. Bad Faith or Other Quasi-Intentional Misconduct
Under the NDD clause, the Fund is liable for delays "caused by [its] bad faith or its willful, malicious, or grossly negligent conduct" (Contract, § 3.05 [7]). 
This language incorporates the common-law rule that "an exculpatory clause is unenforceable when, in contravention of acceptable notions of morality, the misconduct for which it would grant immunity smacks of intentional wrongdoing" (Kalisch, 58 NY2d at 385). "This can be explicit, as when it is fraudulent, malicious or prompted by the sinister intention of one acting in bad faith. Or, when, as in gross negligence, it betokens a reckless indifference to the rights of others, it may be implicit" (id. [citation and footnotes omitted]). But "the effect of the exculpatory clause [can] be overcome only if the qualitative level of misconduct by the contractee [is] the equivalent of an intentional wrong" (Corinno, 67 NY2d at 310; see also Ryan v IM Kapco, Inc., 88 AD3d 682, 683 [2d Dept 2011]).
The Fund first observes that the Complaint makes only a passing and conclusory reference to bad faith: "TPC has been severely damaged by the above-described design errors and omissions and lack of coordination, which were unreasonable and resulted not only from SUCF's bad faith or its willful, malicious, or grossly negligent conduct, but also from its breach of a fundamental obligation of the Prime Contract" (Complaint, ¶ 18).
To similar effect is the LaFraugh Report: "Delays caused by [SUCF] were unreasonable and resulted from [SUCF]'s willful conduct, gross negligence, and bad faith. Consequently, they are compensable" (LaFraugh Report at 5). Similar conclusory and unsupported assertions appear within the time impact analyses ("TIAs") prepared by LaFraugh in 2016 and 2018, which are incorporated by reference into his expert report (see NYSCEF Doc Nos. 364-365; see also NYSCEF Doc No. 194, ¶¶ 24-28).
LaFraugh does marshal factual evidence supporting TPC's claim of bad faith in his rebuttal report (see NYSCEF Doc No. 338 ["LaFraugh Rebuttal"]), but that analysis was directed at showing that the evidence upon which the Fund's experts relied was biased and unworthy of belief, thereby rendering their opinions unreliable (see id. at 7, 18).
Nonetheless, the Fund made diligent efforts to explore the issue of bad faith/quasi-intentional misconduct in deposing TPC's corporate representative and other key personnel, and none of TPC's witnesses testified that the Fund took any action to intentionally frustrate their work or otherwise engaged in bad faith or willful misconduct:
• Stephen Berry (TPC project manager from September 2012 to November 2013): Berry testified that his working relationship with the Fund varied from "good" to "cordial" [*9]depending on who he worked with (see NYSCEF Doc No. 201 at 111-115); the Fund was committed to progressing the work, though not as quickly as he would have liked (see id. at 116); he could not say the Fund took any action to "intentionally" frustrate or impede the work (id. at 117-119); and he did not personally observe any recklessness or negligence on the part of the Fund (see id. at 118-119).
• Barry Gleason (TPC, on project from May 2016 through completion; project manager for part of time): Gleason had a pretty good relationship with Fund personnel, except for Rick Feltman, who he believed was more interested in "checking boxes, as opposed to getting the job done" (NYSCEF Doc No. 203 at 44-46); the only instance of the Fund intentionally frustrating the work concerned the Campus's restriction of certain work to nights and weekends (see id. at 51); and he did not know of any reckless or negligent conduct by the Fund that caused delays (see id. at 52).
• Peter Sukalo (TPC EVP from September 2014 to completion, corporate designee): Sukalo could not identify anyone from the Campus or Fund engaging in reckless or bad faith conduct causing delays (see NYSCEF Doc No. 204 at 54, 56); he believed that the Fund was committed to progressing the work (id. at 55); when asked about intentional actions that delayed the Project, he complained only of (i) the Fund not processing change orders on time, which it "rectified when [TPC] made a big deal about it" (id. at 56), and (ii) the Fund's withholding $5 million at the end of the job on account of liquidated damages (see id.).
Given the absence of anything more than boilerplate references to bad faith in the Complaint and LaFraugh Report, along with the absence of any particularized allegations of bad faith made by TPC's witnesses in their sworn testimony, the Court is satisfied that the Fund has shown, prima facie, that the delays for which TPC seeks recovery were not the product of bad faith or quasi-intentional misconduct.
C.Remaining Exceptions to Enforceability
The Fund is liable for delays "resulting from [its] breach of a fundamental obligation of the contract" (Contract, § 3.05 [7]). In seeking to negate the applicability of this exception, the Fund observes that the Complaint makes only a passing and conclusory reference to breach of a fundamental obligation (see Complaint, ¶ 18). The same is true of TPC's expert reports (see NYSCEF Doc No. 194 ["Maider Aff."], ¶¶ 23, 27-29). 
TPC also may recover for "delays so unreasonable that they constitute an intentional abandonment of the contract by the Fund" (Contract, § 3.05 [7]). But the Complaint only makes a passing and conclusory reference to abandonment (see Complaint, ¶ 17), and neither TPC's fact witnesses nor its experts claim that the Fund abandoned the Contract or the Project (see Maider Aff., ¶¶ 23, 28-30). Given its patent inapplicability, TPC abandoned any reliance on the abandonment exception at oral argument (see NYSCEF Doc No. 503 ["Transcript"] at 60).
D. Conclusion
Based on the foregoing, the Court concludes that the Fund has met its initial burden of [*10]demonstrating that all of the delays and disruption complained of by TPC fall outside the scope of Section 3.05 (7) of the Contract and the common-law exceptions to enforcement of the NDD clause (see MLB Constr. Servs., LLC v Dormitory Auth. of the State of NY, 194 AD3d 1140, 1143 [3d Dept 2021], lv dismissed 37 NY3d 1046 [2021]). 
It therefore becomes the "heavy burden" of TPC to raise a triable issue of fact as to the applicability of one or more of the recognized exceptions to enforcement (Dart Mech. Corp. v City of New York, 68 AD3d 664, 664 [1st Dept 2009]).
IV. TPC'S OPPOSITION
A. Challenge to the Fund's Prima Facie Case
TPC first argues that the Fund's moving papers focus almost exclusively on whether the delays were contemplated, but fail to make out a prima facie case as to the exceptions for intentional/quasi-intentional misconduct and breach of a fundamental obligation:
It is only in attorney Maider's Affirmation in which SUCF argues, from selective and incomplete citations to the depositions of TPC's employees and experts' reports, that TPC cannot prove any other exception to the contract's NDD clause. However, SUCF offers no competent evidence from its own administrators or agents (i.e., Architect's employees) that neither it nor its agents engaged in any intentional or grossly negligent conduct or breached fundamental obligations in connection with the procurement or administration of the TPC contract. SUCF does not even offer an affirmation from a SUCF project participant attesting that [it] endeavored to administer the contract objectively without bias in good faith or disclaiming any knowledge of any relevant SUCF intentional misconduct or gross negligence based on a review of the documentary record in SUCF's possession that could serve as a basis of TPC's delay claims (NYSCEF Doc No. 435 ["Opp Mem"] at 5).
"Given the Project's documentary record in SUCF's possession, TPC submits that SUCF's complete silence on these issues is telling. SUCF's cursory treatment of TPC's allegations of SUCF's intentional conduct/gross negligence and the selective parsing of mostly incompetent evidence . . . are insufficient as a matter of law to meet SUCF's initial burden . . . to negate any material issues of fact concerning the application of the NDD clause to TPC's delay claims" (id. at 6).
The Court rejects TPC's challenges and concludes that the Fund has met its initial burden of sufficiently negating all of the potential exceptions to enforcement of the NDD clause.
As the Fund observes, it "deposed several TPC witnesses with knowledge of the Project delays," including TPC's designated corporate representative, and all of these witnesses were asked "whether SUCF intentionally impeded TPC's work, or engaged in any reckless, negligent or bad faith conduct on the Project. The TPC witnesses did not identify any such misconduct" (NYSCEF Doc No. 463 ["Reply"] at 3; see MLB, 194 AD3d at 1143-1144). 
"Similarly, TPC's three (3) expert reports fail to identify any specific instances whereby [*11]they attribute Project delays to SUCF's willful or malicious conduct, gross negligence or bad faith" (Reply at 3 [citations omitted]). "TPC's opposition relies primarily upon the Affirmation of Carl LaFraugh," but his expert report, while "mention[ing] specific design issues and revisions and shop drawing delays (structural steel, basement conduit, building enclosure, switchboard, and certain parts of the BSB work), . . . does not attribute the delays to SUCF's intentional misconduct, gross negligence and/or bad faith" (id. at 4). And LaFraugh made "no claims [in his deposition] whereby he attributes specific Project delays to SUCF's allegedly intentional wrongdoing, bad faith or gross negligence" (id.; see also Transcript at 19). 
The same is true of the NDD exception for breach of a fundamental obligation, insofar as TPC now argues that the delays were caused by the Fund's breach of its fundamental obligation to provide a complete and buildable design.
B. Incomplete/Deficient Initial Design as the Genesis of All Delays
TPC's principal opposition to the motion rests on the contention that all of the Project delays were caused by the Fund's conduct in soliciting bids based on an incomplete and flawed design with the concealed intention to finish the design after contract award (see Opp Mem at 7-11). TPC primarily argues that these actions fall within the NDD exception for intentional misconduct, but also contends that the same conduct implicates the exceptions for uncontemplated delays (see NYSCEF Doc No. 325 ["Sukalo Aff."], ¶ 8) and breach of a fundamental obligation (see Fruin-Colnon Corp. v Niagara Frontier Transp. Auth., 180 AD2d 222, 229-230 [4th Dept 1992]; Castagna & Son v Board of Educ. of City of NY, 173 AD2d 405, 406 [1st Dept 1991]).
1.TPC's "Genesis" Theory
TPC submits that there is "ample evidence that SUCF knowingly rushed the project to bid notwithstanding the fact that it knew its Architect and its design team had not completed the project design or even their review, coordination and quality control of the project's facially complete plans and specifications" (Opp Mem at 9 [citation omitted]). "Moreover, SUCF knew the design drawings were materially incomplete and likely contained errors when it used them to solicit contractor bids and enter [into] a contract with TPC" (id.). 
TPC further maintains that "it is undisputed that neither the bid set of plans and specifications (including all pre-bid Addenda) nor the contract documents themselves disclosed the presence of these design errors and omissions" (id. at 9-10). "Instead, the contract documents confirmed the reliability of the bid set of design documents and called for the contractor's bid to be in conformity with them" (id. at 10). Consequently, "TPC relied on the accuracy of the intentionally inaccurate bid set of plans and specifications in formulating its build plan for the project and its bid price to execute that plan within the contract schedule" (id.).
"Moreover, the evidence establishes that SUCF and its design team secretly planned before contract award to issue multiple Bulletins to TPC to correct the errors and omissions in the bid set of plans and specifications only after TPC had committed to a fixed price and fixed duration completion schedule for building the Project in full conformity with the bid set of plans and specifications when it signed the Contract" (id. [citation omitted]).
"The evidence is also conclusive that SUCF then did issue multiple Bulletins [*12]immediately following TPC's contract execution to correct some of the design errors and omissions, and then continued to design and redesign the project piecemeal at a leisurely pace for the next 27 months of TPC's original contract schedule" (id. [internal citations omitted]).
"SUCF's design changes implemented over an extended period by the Architect's Bulletins and other directions transmitted through hundreds of responses to RFI's [sic] and the contractor's product submittals and shop drawings and in [FOs] . . . and [COs] cumulatively constituted major revisions to the contract's original design plans and materially altered both the scope of the work TPC had to perform and the cost and schedule to perform them" (id.).
"Thus, all TPC's delay claims have their genesis in SUCF's intentional misconduct or gross negligence in refusing to prepare suitable design documents for its project before soliciting a competitive fixed price bid from TPC and then failing to disclose to TPC its knowledge that the plans were incomplete and defective" (id. at 10-11).
2. TPC's Supporting Evidence
TPC's genesis theory is presented largely through LaFraugh's affirmation in opposition to summary judgment (see NYSCEF Doc No. 337 ["LaFraugh Aff."]), though LaFraugh marshals some of the relevant factual evidence in his rebuttal report.
LaFraugh collected "numerous emails and documents, internal to SUCF and its architect, . . . acknowledging that the Project's design was knowingly incomplete and incorrect when bid on June 5, 2012" (id., ¶ 8). These documents indicate that the "accelerated schedule had much play" in generating the large number of design changes (NYSCEF Doc No. 339). Further, a retrospective examination of the Project by the Fund concluded that the "structural design" for the Project "was not complete . . . due to accelerating the design phase as directed by the Governor's office" (NYSCEF Doc No. 340; see NYSCEF Doc No. 345 [memorializing the Fund's directive to accelerate Project in support of the Governor's economic "stimulus plan"]).
Ennead's internal emails from March 2012 showed that it was unable to timely respond to all design comments due to the acceleration and had to defer corrections to pre-bid addenda (see NYSCEF Doc Nos. 347-350). And by May 2012, just weeks before bid, Ennead determined that it would be unable to make dimensional changes through pre-bid addenda and would instead issue Bulletins following contract award (see NYSCEF Doc No. 351).
On May 29, 2012, the Fund declined Ennead's request to consider any further delay of the bid date and stated that "any outstanding items that Ennead believes would be clarified but due to the lack of time relative to bid date, will not be issued by addendum" (NYSCEF Doc No. 353). "[O]utstanding issues will need to be addressed by bulletin after execution of the contract" (NYSCEF Doc No. 354). Bidders were notified that there would be no further extensions of the bid date, but were not informed of the incomplete design (see LaFraugh Aff., ¶ 17).
Bids were submitted on June 5, 2012, and the Fund directed Ennead to supply it with information concerning items for which it "may need to negotiate change orders . . . immediately upon contract execution," with Ennead directed "to prepare bulletins for relevant items" (NYSCEF Doc No. 355; see also NYSCEF Doc No. 356). The bulletins involved "more substantive clarifications such as additional details, revisions or coordination items potentially increasing or decreasing scope" that would be issued "almost immediately after" the assembly of conformance drawings (NYSCEF Doc No. 357).
On June 27, 2012, however, the Fund directed Ennead not to issue conformance drawings, as they "would be outdated the moment [they] were issued because there would need to be a series of bulletins issued" (NYSCEF Doc No. 361). Five months later, Ennead commented to another consultant, perhaps in a lighthearted fashion: "Stay warm. You can burn the SUNY Downstate Bid Document for fuel" (NYSCEF Doc No. 363).[FN7]
LaFraugh further observes that TPC issued 668 requests for information ("RFIs"), many of which pertained to design, despite the Fund's efforts "to suppress RFIs to avoid liability for delay" (LaFraugh Aff., ¶ 10). Additionally, 141 Bulletins were issued, of which 32 had to be revised (see id., ¶ 11). 
Based on the foregoing, LaFraugh attests:
The lack of completion and coordination in the bid documents directly caused the first nine unresolved delays to TPC. Time for the first delay, 120 days granted by SUCF in . . . [OCO] #2, is resolved but compensation to TPC is not. The remaining eight delays initiated by design defects and presented by TPC are titled "Time Impact Analysis (TIA) 1 — Con Ed Changes," "TIA 2 — Cumulative Steel Revisions," "TIA 3 — Basement Conduit Routing," "TIA 4 — Building Enclosure Delays," "TIA 5 — Switchboard Submittal Changes," "TIA 6 BSB Lobby Access Delays" and "TIAs 7 & 8 — BSB Renovation Delays." In its summary judgment motion, SUCF segregates and analyzes TPC's delays caused by SUCF's "design" problems separately from delays to TPCs work occasioned by "extra work" or "changes." Delays in this latter category are not really separate but resulted from SUCF's intentionally defective design at bid time (id., ¶ 27).
LaFraugh further submits that the initial design issues and resulting delays "distracted SUCF's and TPC's personnel from planning and executing the completion work" (id., ¶ 47):
Final delays on the Project . . . relate to initial design defects for a few reasons. First, because the design team was devoted pre-bid to its failed attempt to complete the design, the design team did not do due diligence — the Design team did properly review and coordinate the bid documents to ensure drawings were internally consistent between interconnected portions of the Project. Because SUCF and its design team were still designing after Project award, they had far less time to review and resolve contractor's submittals and RFIs,. . . [which] were increased by the many design errors in uncoordinated drawings (id., ¶ 28).
3. Analysis
As discussed in Part III (B), supra, none of TPC's fact witnesses, including its corporate designee, articulated the "genesis" theory during discovery or attributed all of the Project delays to the alleged incomplete and flawed initial design. And TPC's fact witnesses did not identify [*13]any conduct by the Fund that intentionally impeded its work or rose to the level of bad faith, reckless or grossly negligent conduct in relation to the initial design.
Nor does the "genesis" theory appear in LaFraugh's expert report dated July 22, 2024, in which he was obliged to disclose "a complete statement of all opinions [he] will express and the basis and the reasons for them," along with "the data or other information considered . . . in forming the opinion(s)" (Rules of Commercial Div of Sup Ct [22 NYCRR 202.70 (g)] rule 13 [c] [A-C]). Despite disclosing hundreds of pages of TIAs delving deeply into "specific design issues and revisions and shop drawing delays (structural steel, basement conduit, building enclosure, switchboard, and certain parts of the BSB work)," the LaFraugh Report "does not attribute the delays to SUCF's intentional misconduct, gross negligence and/or bad faith" (Reply at 4). 
In his rebuttal report of November 1, 2024, LaFraugh does collect secondary evidence of shortcomings in the initial design, primarily in the form of internal emails between and among Ennead, the Fund and subconsultants. However, this material was included to show that the evidence relied upon by the Fund's experts to assign blame for the delays to TPC was "biased," thereby rendering their opinions unreliable (see LaFraugh Rebuttal at 7, 18).
And despite having been examined under oath by the Fund at considerable length as to his opinions regarding Project delays and their causes, LaFraugh did not articulate TPC's genesis theory in his December 2, 2024 expert deposition (see NYSCEF Doc No. 461; Reply at 4).
It was not until May 12, 2025, following the completion of all fact and expert disclosure and the filing of the note of issue, that LaFraugh submitted an affirmation offering the opinion that the initial OCO #2 delays, the structural steel revision delays, the basement conduit routing delays, the building enclosure delays, the switchboard submittal delays, the BSB lobby access delays and the BSB renovation delays all were caused by shortcomings in the initial design documents and the Fund's failure to disclose: "SUCF and its Architect knew defects existed in the bid documents. TPC did not know or include time and costs to correct these defects. The defects eventually delayed TPC. The lack of completion and coordination in the bid documents directly caused the [foregoing] nine unresolved delays to TPC" (LaFraugh Aff., ¶ 27). 
LaFraugh further attests, again for the first time, that the inspection, commissioning and training delays all "relate to the initial design defects," on the theory that the design consultants' focus on completing the initial design distracted them from ensuring that drawings were internally consistent and gave the consultants "less time to review and resolve contractor's submittals and RFIs" (id., ¶ 28).
In reply, the Fund complained that TPC "improperly expanded upon its witness testimony and expert opinions" through a new causation theory, offered for the first time in opposition to summary judgment, that all of the delays have their genesis in the "defective and/or incomplete [original] design drawings" (Reply at 4). "TPC gives no explanation why it waited until after discovery closed to characterize SUCF's actions regarding the original design documents as intentional misconduct, gross negligence and/or bad faith," and "SUCF is now prejudiced because it was deprived of a full and fair opportunity to defend against these claims" (id. at 5). The Fund took particular issue with LaFraugh's failure to "relate the various design issues back to the allegedly incomplete or defective original design documents" (id. at 4). 
The Court found that the Fund's reply "raise[d] a legitimate question regarding the adequacy of TPC's expert disclosure, particularly in terms of the causal connection between the alleged shortcomings in the initial design documents and the various delays encountered by TPC" (NYSCEF Doc No. 476). Accordingly, TPC was directed to file a sur-reply to respond to SUCF's claim of ambush (see id.).
However, TPC's sur-reply did not identify any previously-disclosed expert support for the genesis theory or LaFraugh's sweeping new opinion that all of the Project delays were "directly caused" by deficiencies in the initial design. Instead, TPC focused on unremarkable propositions that only serve to deflect from the lack of proper expert disclosure, citing: (i) conclusory language from the Complaint generally invoking all four NDD exceptions (see NYSCEF Doc No. 477 at 1-2); (ii) the recitations of factual evidence made by LaFraugh in rebutting the opinions of the Fund's delay experts (see id. at 2-6); (iii) LaFraugh's expert report and the incorporated TIAs from 2016 and 2018, which include passing references to NDD exceptions but do not disclose or offer opinions regarding the genesis theory (see id. at 6-8); and (iv) deposition testimony and other factual evidence bearing on specific delays, none of which refers to the genesis theory (see id. at 8-11). 
And TPC effectively concedes in sur-reply that neither LaFraugh's expert report nor his rebuttal report disclosed the opinion that the initial design deficiencies were the cause of the delays sued upon by TPC. This is apparent from TPC's argument in sur-reply that the Fund incorrectly dismissed LaFraugh's rebuttal report because it "did not contain the correct 'magic words' — that these causes and delays were due to SUCF's bad faith or willful misconduct" (id. at n 2). According to TPC, this disregards "the actual documentary evidence" supporting "the ultimate determination of bad faith or willful misconduct" collected by LaFraugh (id.).
But TPC's arguments miss the point. Even assuming that the factual record shows conduct by the Fund giving rise to an NDD exception relative to the initial design,[FN8]
there still must be competent proof that such conduct caused the delays for which TPC seeks to recover. TPC is entitled to delay damages only for conduct that is "properly attributable to [SUCF's] actions or lack thereof" (Five Star Elec. Corp. v A.J. Pegno Constr. Co., Inc./Tully Constr. Co., Inc., 209 AD3d 464, 465 [1st Dept 2022]), and it must be those actions or inactions that give rise to an NDD exception. In other words, TPC must establish "delays caused by the [Fund's] bad faith or its willful, malicious, or grossly negligent conduct" or "delays resulting from [its] breach of a fundamental obligation" (Corinno, 67 NY2d at 309 [emphasis added]).
Thus, the issue is not whether the record includes proof of facts supporting TPC's claim of bad faith or whether that evidence was disclosed during discovery. The critical issue raised by the Fund is whether TPC properly disclosed an expert opinion, formed by reference to a [*14]professionally-reliable methodology, that each of the delays for which TPC is seeking recovery was "caused by" or "result[ed] from" initial design deficiencies.
As stated above, TPC did not disclose a causation opinion for its genesis theory prior to its May 12, 2025 opposition to summary judgment (see Transcript at 12), and the opinion belatedly disclosed therein is entirely conclusory in character: "SUCF and its Architect knew defects existed in the bid documents. TPC did not know or include time and costs to correct these defects. The defects eventually delayed TPC. The lack of completion and coordination in the bid documents directly caused the [delays]" (LaFraugh Aff., ¶ 27).[FN9]

It also bears emphasis that LaFraugh's opinions regarding deficiencies in the initial bid documents were not based upon an actual review of those documents. Neither LaFraugh nor any other TPC expert has opined as to any specific omissions or deficiencies in the initial design, and TPC did not depose any of the Fund's design consultants or submit their deposition testimony in opposition to the Fund's motion (see NYSCEF Doc No. 460, ¶ 3).
Instead, TPC relies upon a selective review of secondary evidence, largely emails, which do indicate that certain aspects of the initial design were not fully completed prior to bid. But TPC "fails to provide any meaningful specifics to establish what part of the design was incomplete and/or defective" (Reply at 7). Nor did TPC attempt to "relate [specific] alleged defects in the original design documents" to the specific delays sued upon by TPC (id. at 8).
For all of the foregoing reasons, the Court concludes that TPC has not raised a triable issue of fact on its theory that all of the Project delays were caused by deficiencies in the initial design documents and the Fund's concealment of such deficiencies.[FN10]

C. Intentional Maladministration
TPC further contends that the delays caused by the flawed initial design were extended due to the Fund's intentional misconduct and gross negligence (see Opp Mem at 11-12). TPC cites, among other things:
• Gilbane's recruitment and hiring of several TPC managers during the Project (see [*15]LaFraugh Aff., ¶ 33; see also NYSCEF Doc Nos. 374-375).
• Letters from October 2013 through August 2014 in which the Fund advises TPC that only delays approved in accordance with the Contract Documents could be included on the Project schedule (see NYSCEF Doc No. 326-328), a directive that TPC insists was issued "to hobble [its] ability to effectively manage its work" (Opp Mem at 12). • The Fund, Ennead and Gilbane "intentionally caus[ing] and aggravat[ing] delay by not responding [to RFIs] within the specified time," which was "in addition to late approvals of changes and submittals" (LaFraugh Aff., ¶ 34; see id., ¶ 35 [despite knowing in September 2015 of TPC's delay claim, "SUCF and its design team frequently and intentionally disregarded its obligation to answer RFI's within 10 days"]; ¶ 36 [collecting emails said to reflect "SUCF's continuing indifference as to the effect of late responses on TPC"]; see also NYSCEF Doc Nos. 378-381, 383, 388-339, 395-396).
• Emails from the February 2014 timeframe in which the Fund allegedly "sought to shift responsibility to TPC and increase pressure on TPC to accelerate" (LaFraugh Aff., ¶ 36 at p. 11). The emails were directed at the "lack of progress on the project" (NYSCEF Doc No. 397) and expressed the view of a Fund representative that "we need to make ourselves heard. Demand weekly meetings, remove [managers], hold back payments whatever it takes [to] step up the pressure and make things uncomfortable until TPC resolves their project management issues and the job starts to move" (id.; see also NYSCEF Doc No. 398 [expressing the view that the Fund "need(ed) to be relentless with (TPC's) management to correct the project"]).
• Correspondence in which Gilbane notes its strategy of documenting events with TPC's impending delay claim in mind (see NYSCEF Doc No. 400).
• Excessive criticism of TPC by Gilbane (see NYSCEF Doc Nos. 401-408).
• The Fund's "collu[sion] in creating and 'documenting the roadblocks, claims and failures of the contractor'" (LaFraugh Aff., ¶ 36 at p. 13; see NYSCEF Doc No. 409), including efforts by Ennead and Gilbane to analyze Project bulletins to show "they did NOT delay the project" (NYSCEF Doc No. 410).
The Court concludes that the evidence adduced by TPC falls short of demonstrating intentional or quasi-intentional maladministration of the Project. For the NDD clause to be unenforceable, "the misconduct for which it would grant immunity [must] smack[] of intentional wrongdoing," which encompasses "gross negligence" of a type that "betokens a reckless indifference to the rights of others" (Kalisch, 58 NY2d at 385). But regardless of labels, the NDD clause can "be overcome only if the qualitative level of misconduct by the [Fund is] the equivalent of an intentional wrong" (Corinno, 67 NY2d at 310).
Even viewed in a light most favorable to TPC and with the benefit of all favorable inferences, the issues raised by TPC concerning administration of the Contract and Project cannot reasonably be viewed as tantamount to intentional wrongdoing. 
The Fund was not involved in Gilbane's poaching of TPC employees, and TPC's own witness confirmed that the Fund was displeased by Gilbane's actions (see NYSCEF Doc No. 374 at 38-39). 
And there is no competent evidence that the Fund's designers intentionally failed to give timely responses to RFIs and submittals. TPC's attempt to dress-up its allegations by repeatedly characterizing the Fund's conduct as evincing "reckless indifference" does not transform garden-variety delays, or even actual negligence, into the equivalent of intentional wrongdoing (see e.g. Sukalo Aff., ¶¶ 14 ["recklessly indifferent"], 26 ["recklessly indifferent"], 28 ["reckless disregard"], 32 ["reckless indifference"], 35 ["recklessly indifferent"], 37 ["reckless refus(al)"], 46 ["reckless disregard()"]; Opp Mem at 2 ["reckless indifference"], 12 ["reckless indifference"], 14 ["reckless indifference"], 16 ["recklessly indifferent"]; LaFraugh Aff., ¶¶ 5 ["complete indifference"], 30 n 3 ["indifferent"], 33 ["utter indifference"], 35 ["indifference"], 36 ["continuing indifference"]).
Finally, TPC places great weight on the Fund's internal strategy emails, but the Court has reviewed them carefully and concludes that they show nothing more than a hard-nosed Project owner responding to a general contractor who was not adequately progressing the work (in the view of the Fund) and who was openly and obviously preparing to litigate its claims for delay damages as far back as early 2015, more than three years prior to substantial completion. And given the clear prospect of litigation, it would have been irresponsible for the Fund not to have "'document[ed] [TPC's] roadblocks, claims and failures'" (LaFraugh Aff., ¶ 36 at p. 13).
D. Analysis of Specific Delays
1. OCO #2
TPC's initial work included preparation of the new BSB entrance and relocation of utilities to permit excavation for the NAB. TPC asserts that, as the first work, this phase should have been especially well designed and coordinated, but it took "[t]hirteen bulletins, plus resolution of three other Owner issues . . . to begin excavation" (LaFraugh Report at 8).
a. Execution of OCO #2
TPC first argues that the Fund acknowledged responsibility for the initial delays by countersigning OCO #2 with an attached letter from TPC stating that the change order addressed "uncontemplated" delays (see NYSCEF Doc No. 133 at 2).
As properly observed by the Fund, however, a reservation of rights to seek additional time and/or compensation does not automatically entitle TPC to additional time and/or compensation (see Walsam 316 v 316 Bowery Realty Corp., 226 AD3d 628, 629 [1st Dept 2024] ["a reservation of rights does not create new rights"]). And there is nothing in OCO #2 evidencing the Fund's assent to TPC's characterization of the delays as uncontemplated (see Feltman Aff., ¶ 27 ["business accommodation to TPC"]). At best, TPC's reservation of rights forecloses the Fund from arguing that TPC waived its right to seek additional time and/or compensation by assenting to the no-cost change order.
b. Initial Design Deficiencies
In his 2016 Analysis, LaFraugh opined that the delays covered by OCO #2 were "primarily" caused by "Owner-directed work and changes, which prevented access to the job [*16]site" (NYSCEF Doc No. 364 ["2016 Analysis"] at 11).[FN11]
LaFraugh further opined that many of the initial changes "were the result of Owner's poor coordination and planning. How the public would access the BSB while the adjacent NAB was being built had not been reasonably planned in advance by" the Fund (id. at 15).
In his affirmation in opposition to the motion, LaFraugh attempts to establish a causal connection between this "poor coordination and planning" and deficiencies in the initial design documents: "SUCF and its Architect knew defects existed in the bid documents. TPC did not know or include time and costs to correct these defects. The defects eventually delayed TPC. The lack of completion and coordination in the bid documents directly caused the first nine unresolved delays to TPC," including the delays associated with OCO #2 (LaFraugh Aff., ¶ 27).
As the Fund observes in reply, however, TPC's opposition makes no effort to relate the various bulletins and directives that delayed its initial work — covering such diverse items as the replacement of asphalt infill with concrete, details regarding a surveillance camera, temporary signage and landscape modifications (see 2016 Analysis at 15-17) — to any particular incompleteness or deficiencies in the initial design documents. Nor has TPC offered an expert opinion from an architect or engineer establishing any particular defects or incompleteness in the initial design.
Moreover, the prospect of coordination and planning deficiencies are within the contemplation of a general contractor on a complex construction project, and there is no dispute that TPC was compensated for any extra work performed through field and change orders.
Finally, it is not proper for TPC to oppose summary judgment on the basis of expert opinions from LaFraugh that were not properly disclosed. Commercial Division Rule 13 (c) (A) requires the expert's report to contain "a complete statement of all opinions the witness will express and the basis and the reasons for them," and there is nothing in LaFraugh's expert report (including the incorporated 2016 Analysis) or in his rebuttal report specifically tying the OCO #2 delays to initial design deficiencies.[FN12]
Based on the foregoing, the Court concludes that TPC has not raised a genuine factual dispute as to whether the initial delays were caused by, or resulted from, the alleged incomplete and defective initial design.
c. Non-Design Delays
TPC has not established that the delays associated with obtaining municipal approvals and permits, including the FDNY call box, various disposal permits and approvals for street closure (see 2016 Analysis at 17-18), were uncontemplated (see Contract, § 2.10). These are "common garden variety delay[s]" (Reply at 10-11). And the exploratory demolition complained of by TPC was expressly contemplated (see Feltman Aff., ¶¶ 46-49; see also NYSCEF Doc No. 138 at 3).
[*17]2. Bulletin 1 — Con Ed Vault
TPC alleges that the Fund is responsible for any delays associated with Bulletin 1, which revised the design of the Con Ed Vault (see LaFraugh Report at 8; see also Complaint, ¶ 7). TPC asserts that the Fund failed to coordinate with Con Ed until the Contract was awarded and construction already was underway, which is said to have been uncontemplated (see 2016 Analysis at 22; see also LaFraugh Aff., ¶ 41).
However, even assuming that the Con Ed Vault changes were uncontemplated (or fall within some other NDD exception), TPC's delay analysis does not identify any days of compensable delay associated with the Vault (see LaFraugh Report at 11). According to LaFraugh, the extra work associated with the Vault was the subject of OCO #6, signed on July 25, 2014, which resolved TPC's direct costs, and a time extension was not included due to (i) the time extension granted by OCO #2, and (ii) TPC's successful mitigation of remaining delays (see 2016 Analysis at 29-30). 
As TPC has not identified any compensable days of delay associated with the Con Ed Vault, the Fund is entitled to the dismissal of any claim for damages based on such delays.
3. Structural Steel Revisions
TPC argues that delays associated with structural steel revisions were the direct result of the Fund's bad-faith decision to go to bid on an incomplete design: "The evidence is overwhelming that the Architect and SUCF recognized that TPC's contract set of structural drawings were effectively placeholder drawings that would need major revision after contract award" (Opp Mem at 14; see also Part IV [B], supra).
In his 2016 analysis, LaFraugh attests that TPC and its subcontractors were not affected by the steel revisions until January 10, 2014, when erection began (see 2016 Analysis at 42). "In large part, this occurred because the erection of the steel work was delayed by the 120 days" associated with OCO #2 (id.). 
With regard to the delays encountered from January 10, 2014 through March 25, 2014, LaFraugh pointed to the issuance of Bulletins #50 and #63, which revised "numerous structural steel elements[,] resulted in delays to the structural steel submittals, delayed submittal approvals and in turn delayed fabrication and erection" (id. at 42; see id. at 42-44). According to LaFraugh, these issues "were not contemplated by TPC" (id. at 33).
In opposition to summary judgment, however, LaFraugh attests that the foregoing Bulletins were issued "to correct knowingly defective plans for structural steel" (LaFraugh Aff., ¶ 42), and LaFraugh opines that the "lack of completion and coordination in the bid documents directly caused" the steel delays (id., ¶ 27).
But LaFraugh acknowledges that by the time TPC was affected by the steel issues, the structural steel design had been completely overhauled through major revisions made by the consultants from October 2012 to November 2013 (see 2016 Analysis at 31-32). The changes made over this 14-month period included an October 22, 2012 bulletin that "was a major revision with 51 drawings that impacted all floors" (id. at 31), a March 25, 2013 bulletin that "contained 16 sketches revising 16 structural drawings" (id.) and a host of minor revisions and clarifications (see id. at 31-32). 
Yet, neither TPC nor its experts make any attempt to address how the structural steel delays were caused by or resulted from uncontemplated shortcomings in the initial design (see Corinno, 67 NY2d at 309), rather than by contemplated design errors in the work performed by the consultants over the 14 months preceding the start of TPC's erection work (see Reply at 11-12). Nor has TPC shown that the initial design shortcomings caused or contributed to the delays associated with the shop-drawing and revision process (see id.).
LaFraugh did not offer any review or analysis of the initial design, and there is no record proof that would allow the trier of fact to conclude that the design, coordination and submittal issues encountered by TPC from January to March of 2014 would have been avoided had the Fund fully completed the structural steel drawings by June 2012, rather than finishing the design in the 14 months preceding the start of TPC's scheduled erection work. Absent a properly disclosed opinion of a qualified expert, the trier of fact would be left to speculate whether the early 2014 delays stemmed from some unspecified deficiencies or incompleteness in the initial design or were the kind of routine errors made in the redesign process that fall within the contemplation of a general contractor and the protection of the NDD clause.
Given the absence of a non-speculative basis for drawing a causal connection between deficiencies in the June 2012 design documents and the delays encountered during the erection of structural steel in early 2014 following major design revisions, the Court concludes that TPC has not raised a triable issue of fact as to an NDD exception for the structural steel delays.
4. Basement Conduit Routing
TPC similarly contends that issues with the basement conduit routing "should have been resolved pre-bid or even after bid in 2013 by SUCF's electrical engineer, JBB" (Opp Mem at 14).
In his 2016 delay analysis, LaFraugh states that TPC's electrical subcontractor identified issues with the design of the "conduit penetrations of the BSB building foundation wall," giving rise to the issuance of Bulletin #66 on April 14, 2014 (2016 Analysis at 45). The bulletin "completely revised the conduit routing" and added spare conduits in the concrete encasement (id.). Additional issues were identified during the submittal review process and corrected on July 17, 2014 via Bulletin #66, Revision 1 (see id. at 46).[FN13]

In opposition to the motion, LaFraugh again relies upon his blanket opinion that defects in the bid documents "directly caused" the delay (LaFraugh Aff., ¶ 27). LaFraugh further affirms that "the need for Bulletin 66, its revision and resultant delay originated from design defects. Conduit routings were not coordinated with acceptable penetration locations nor were spare conduits provided" (id., ¶ 43). LaFraugh also maintains that the "defects were not timely corrected as two bulletins, Bulletins 66 and 66R1 were necessary" (id.). 
Critically, TPC also submits proof from Fund officials admitting that the "accelerated [*18]schedule had much play" in giving rise to the conduit delays. "Ennead had indicated that the slab edge drawings were not 100%, details were still being coordinated, these are difficult curb conditions that need a lot of attention and we needed to Bid" (NYSCEF Doc No. 339; see also Sukalo Aff., ¶ 23). "The coordination of mechanical house pads was behind, as [the Fund's electrical designer] was really trailing behind Ennead design refinements" (NYSCEF Doc No. 339).
Thus, the Fund's own documents provide at least some evidence that the conduit delays were caused by the Fund's uncontemplated decision to put the Project to bid before fully completing the design. And unlike the structural steel revisions, there is no evidence that the design consultants comprehensively revisited the conduit routings between the bid date and the start of the delays. The Court therefore concludes that TPC has raised a triable issue of fact as to delays associated with the conduit redesign.
However, the Court agrees with the Fund that there is no competent evidence that the Fund's delays in responding to submittals were themselves the product of the shortcomings in the initial design documents, bad faith or other NDD exception. Accordingly, the conduit delay claim is dismissed only to that extent.
5. Building Enclosure Delays
"As with the other building systems and elements described above, SUCF deliberately failed to finalize the design of the cement panels and their fasteners before soliciting bids for the Project" (Opp Mem at 16 [citations omitted]). "However, instead of fixing the design immediately after contract award, SUCF's design team then waited until TPC's subcontractor submitted its product shop drawings for the panels based on the original defective drawings to evaluate and correct its original incomplete and defective design in a series of deliberately late and incomplete responses to the subcontractor's shop drawing submittals" (id.).
In his expert report, LaFraugh offers some complaints about delays in the review of submittals, but he largely focuses on design changes. In Revision 2 of the shop drawings, Ennead identified an issue with slab deflections, which required revised joint dimensions (see 2016 Analysis at 52-53). The same revision indicated that the joints should be "align[ed] around the building," which is said to be a new requirement (id. at 54 [emphasis omitted]). 
Another issue then was identified "involving the quantity and layout of fasteners at the top of the building due to wind loading" (id.). After a conference call with all involved parties, including the manufacturer, a revised rivet pattern was established to resolve the wind loading issue and satisfy Ennead's aesthetic concerns (see id. at 55).
In opposing the motion, LaFraugh affirms that "[d]elays to approvals of the submittals were caused by design defects that should have been corrected prior to bid through proper coordination and due diligence, but were not due to the intentional rush, and improper reviews conducted after bid to enact design corrections" (LaFraugh Aff., ¶ 44). "During these reviews, changes were made causing extra work. One change was additional fasteners. SUCF failed to timely issue a notice to proceed with this change. They did not grant time for numerous approved changes made during the mockup process, necessary for work to proceed" (id. [citations omitted]; see also Sukalo Aff., ¶¶ 24-25).
Although LaFraugh attests that the enclosure delays were caused by the Fund's deliberate [*19]failure to complete the design of the fiber cement panels before soliciting bids, he does not provide any basis for causally connecting these delays to any particular incompleteness in the initial design. To be sure, the submittal and shop-drawing process identified issues with slab deflections, wind loading and the failure to fully coordinate fastener alignment, but these are precisely the kinds of issues that the shop drawing process is intended to address, particularly where critical safety-related issues are discovered during the work.
And there is no evidentiary support for TPC's assertion that the Fund "deliberately failed to finalize the design of the fiber cement panels and their fasteners before soliciting bids" and, instead, intentionally "waited until TPC's subcontractors submitted . . . shop drawings . . . to evaluate and correct its original incomplete and defective design" (Sukalo Aff., ¶ 24).
Finally, TPC has failed to demonstrate that the delays in submittal review have any causal connection to the initial design defects or were outside TPC's contemplation in light of the detailed shop-drawing process established in the Contract.
6. Switchboard Submittal Changes
In June 2013, about one year after bid, a switchboard submittal was returned for correction with a direction to expand capacity "to feed in future ASE building with 15 sets" (2016 Analysis at 63). According to LaFraugh, the decision to add future electrical capacity "necessarily resulted" in the depth of the switchboard increasing, and the Fund's designer should have anticipated the need for "a larger electrical room" (id. at 63-64).
In February 2015, an expanded 48" switchboard was delivered, but it did not fit in the 36" dimension specified in the Contract Documents (see id. at 64). TPC requested design approval for the delivered unit, to which JBB (the electrical designer) responded with requests for clarification and supplementation (see id. at 64-65). TPC resubmitted the information on May 26, 2015 as a 208-page document (see id. at 65). 
The submittal was again returned to TPC to, among other things, verify that it would be possible for maintenance workers to service the switchboard (see id. at 68). It was not until July 29, 2015, at a jobsite meeting, that all parties agreed on an approach to the switchboard. A new submittal subsequently was returned to TPC with sufficient guidance to allow it "to mount the panels and complete the conduit routing and cabling, ending the delay" (id. at 68-69).
Based on the foregoing, LaFraugh opines that the Fund is responsible for delays from March 25, 2015, "when agreement on an acceptable configuration would have been reached . . . if [Ennead had] acted reasonably and timely after the February 9, 2015 meeting," until September 11, 2015, when the Revision 5 submittal was returned for correction (id. at 69-70; see also Sukalo Aff., ¶ 28).
In opposition to the motion, however, TPC argues that the failure of the Fund's designers to "correct the incompatibility of the switchboard with its pad is the direct result of SUCF's demand that the Project go out to bid before the design plans for the contract were reasonably complete and fully coordinated" (Opp Mem at 15-16). In addition to his conclusory and unsupported "genesis" opinion, LaFraugh affirms that the issue of the housekeeping pad being undersized, like the conduit issue, "was known at bid time," and the problem was the inadequate coordination prior to bid (LaFraugh Aff., ¶ 45).
The Court is unpersuaded by TPC's contentions. As observed by the Fund, it was TPC's subcontractor, Tru-Val, that redesigned the switchgear, and the manufacturer, Eaton, failed to conform the switchgear to the redesigned layout submitted by TPC and Tru-Val (see Feltman Aff., ¶ 60). For this reason, a TPC project manager testified that the delivered switchboard's failure to "match the approved submittals" was the fault of the "[m]anufacturer, as well as the guy [from Tru-Val] who ordered it" (NYSCEF Doc No. 462 at 119-121). 
Additionally, the Project specifications provided that "responsibility for initial access, maintenance access . . . and proper fit rests with" TPC and its electrical subcontractor (NYSCEF Doc No. 143 at 16). The same specifications obliged TPC to "[c]arefully check space requirements with other Sections of the Contract Documents to insure that all material can be installed in the spaces allotted thereto" (id.; see Feltman Aff., ¶¶ 63-64; see also NYSCEF Doc No. 146 [directing TPC to ensure that the switchboard submittal was "fully coordinated. . . . Conduit feeders can't block any available spares in the boards."]).
Moreover, the parties used the shop-drawing process to make the necessary corrections to accommodate the incorrectly-sized switchboard (see Feltman Aff., ¶ 66; NYSCEF Doc Nos. 144-145), and there is no competent evidence that the switchgear issue or the delays in processing the associated submittals were caused by the Fund's uncontemplated or bad-faith failure to complete the initial design prior to bid.
Based on the foregoing, TPC has failed to raise a triable issue of fact as to an exception to the NDD clause for the switchboard delays.
7. BSB Lobby Access Delays
TPC contends that it was denied access to the BSB lobby in June 2015 because the Fund "failed to identify and resolve issues with the design . . . despite more than two years passing since the start of field work" (Opp Mem at 17; see Sukalo Aff., ¶ 29). 
After considerable discussion in 2014 and several meetings in 2015, renovation of the BSB was set to begin on July 7, 2015 (see 2016 Analysis at 76-81). However, due to delays in relocating an ATM machine and coffee cart, along with the need to retain a professional mover to temporarily relocate a statue and legacy glass wall, TPC could not begin until February 16, 2016 (see id.). LaFraugh therefore opined in his 2016 analysis that the lobby access delay was caused by the Fund's failure "to identify and resolve design issues despite more than two years passing since the start of field work" (id. at 73).
In opposing summary judgment, LaFraugh now affirms that the delays in accessing the BSB lobby "were caused by SUCF not coordinating the BSB work with the campus, DMC, prior to bid," which "resulted from the Project being rushed to bid and [the] known dysfunctional relationship" between the campus, Fund and Ennead (LaFraugh Aff., ¶ 46).
The Court is unpersuaded by TPC's pivot regarding the BSB lobby. Issues concerning a coffee cart, ATM machine and the temporary relocation of items during the construction work are run-of-the-mill issues encountered on a project involving an existing facility, and neither TPC nor its expert articulates any plausible reason to believe that the alleged rush to bid in 2012 played a role in routine coordination issues involving these items three years later.
Moreover, LaFraugh's expert report does not establish a causal connection between the coordination issues encountered in obtaining access to the BSB lobby and the unspecified and [*20]unparticularized shortcomings in the original design documents alleged by TPC. In fact, the Contact Documents disclosed the requirement of salvaging the statue and relocating the ATM machine and the need to coordinate this work with the Campus (see Feltman Aff., ¶ 85; NYSCEF Doc No. 155 [dated April 10, 2012]). LaFraugh merely observes that the Fund had ample time to resolve these issues prior to mid-2015 (see 2016 Analysis at 73).[FN14]
Finally, LaFraugh's conclusory attestation of reckless indifference lacks factual support, and there is no reasonable view of the evidence that would allow these routine coordination delays to be deemed tantamount to intentional misconduct.
8. BSB Renovation Delays
TPC argues that the protracted delays encountered in completing the BSB renovations were due to the Fund's "deliberate decision not to complete the design for renovations before contracting with TPC" (Opp Mem at 17-18). "This was compounded by SUCF's failure to timely respond to RFIs and provide direction necessary to address the incomplete and defective design issues during construction" (id. at 18; see Sukalo Aff., ¶¶ 36-48). 
In the portion of his analysis covering delays through June 30, 2016, LaFraugh focuses on four issues: (i) the November 10, 2015 bulletin directing replacement of the existing fire sprinkler system (see 2016 Analysis at 84-86); (ii) the need for exploratory work and design revisions to ensure sufficient lintel support (see id. at 86-91); (iii) the addition of a second fire panel to protect the building while the existing panel was put out of service for demolition work (see id. at 91-93); and (iv) revisions to the basement work reflecting the discovery of asbestos and some access issues (see id. at 93-97).
In his second delay analysis, from July 1, 2016 to Project completion, LaFraugh discusses the additional impacts associated with the foregoing delays and identifies seven additional sources of delay: (v) revision of an electrical panel location due to existing conditions (see NYSCEF Doc No. 365 at 28); (vi) the discovery of a "hot circuit" during plumbing revisions (see id. at 28-29); (vii) the addition of fire-rated walls (see id. at 29-30); (viii) the need for direction regarding the transition areas of the terrazzo floor (see id. at 32-35); (ix) delays in obtaining approval relating to working hours (see id. at 35-43); (x) revisions to the stairway renovation and ceiling height, including extra work and design clarifications (see id. at 43-47); (xi) millwork delays resulting from the foregoing revisions (see id.); and (xii) the discovery that "several key utility elements were . . . unsupported" (id. at 47-48).
Although LaFraugh's incorporated TIAs referenced a number of specific design deficiencies that gave rise to extra work directives, RFIs and Bulletins, his analyses provide no support for TPC's assertion that the delays were caused by the Fund's "deliberate decision not to complete the design for renovations before contracting with TPC" (Opp Mem at 17-18).
It is only in his affirmation in opposition that LaFraugh first draws a causal connection: "The lack of completion and coordination in the bid documents directly caused [the BSB renovation delays]" (LaFraugh Aff., ¶ 27). Specifically, LaFraugh affirms that the delays were [*21]caused by poor coordination between the Fund and the Campus "prior to bid," which "resulted from the Project being rushed to bid and a known dysfunctional relationship between [the Campus, Fund and Architect] prior and after bid" (id., ¶ 46).
The Court concludes that the proof adduced by TPC is inadequate to raise a triable issue of fact on its claim that the BSB renovation delays were caused by the Fund's decision to go to bid with incomplete design documents. Again, TPC makes no effort to relate the design defects giving rise to the BSB renovation delays to any specific omission or deficiency in the allegedly incomplete and rushed design. 
And while some emails submitted by TPC "suggest that certain unspecified design documents were 'incomplete' and required clarification" (Reply at 7), there is no direct evidence of specific gaps in the initial design affecting the BSB renovation. And there is no properly-disclosed and supported expert opinion establishing a causal connection between any incompleteness in the initial documents and the particular BSB renovation delays for which TPC seeks recovery. Thus, the trier of fact would be left to speculate, which is not proper.
Settled law recognizes that delays caused by "design defects" due to "faulty architectural drawings" is a known and contemplated risk on construction projects; hence, the recognition that such delays necessarily are within the contemplation of a general contractor (LoDuca, 91 AD3d at 485-486). This is true "even if [the project owner] knew or should have known of the alleged defects by reason of information it had prior to the contract" (id. at 486). To rise to the level of an uncontemplated delay, a delay caused by quasi-intentional misconduct or breach of the fundamental obligation to provide a buildable design, there must be competent proof identifying the particular omission or deficiency in the initial drawings and connecting it with reasonable certainty to delays sued upon. TPC has not supplied such proof for the BSB renovation.
Moreover, close examination of the specific delays and causes cited in LaFraugh's report supports the Fund's position that the BSB renovation delays were caused by contemplated risks unrelated to the alleged incompleteness of the initial design, including owner-directed extra work and field order work. 
Many of the design changes were engendered by the discovery of existing conditions, including: (i) fire suppression changes (see Feltman Aff., ¶¶ 91-94; NYSCEF Doc No. 344 at Item 103); (ii) the need for additional structural steel supports, which was revealed during demolition (see Feltman Aff., ¶¶ 98-101); (iii) the discovery of space constraints in the electrical closet that occasioned TPC's request to relocate the electrical panel (see id., ¶¶ 122-125); and (iv) the discovery of gaps in fire-rated walls (see id., ¶¶ 130-136). 
And other change and field order work reflected SUCF's prerogative to make minor design changes during the course of the work, such as: leaving the existing CMU wall in place and deleting the new wall from TPC's scope of work (see id., ¶¶ 126-129); providing additional guidance regarding flooring and ceiling transitions (see id., ¶¶ 138-148); and changing the stair millwork (see id., ¶¶ 159-162).
Moreover, insofar as the issues involved coordination with the Campus, the Contract Documents explicitly cautioned TPC that the medical school "intend[ed] to maintain a full institutional program throughout the Project duration," and TPC was obliged to establish a schedule "in cooperation with the Campus" that allowed the Campus to continue its operations [*22]without "unscheduled interruption of the normal institutional activities and processes" (NYSCEF Doc No. 138 at 5). TPC also was on notice that certain work, including end-of-shift cleanup, would have to be performed on nights and weekends to avoid interfering with the Campus's ongoing programs and activities (see id. at 14, 17; NYSCEF Doc No. 184).[FN15]
Based on the foregoing, TPC has failed to demonstrate that the BSB renovation delays fall within any NDD exception.
9. Rolling Completion List, Inspections, Commissioning and Training
TPC maintains that the Fund maladministered the rolling completion list ("RCL") by "allow[ing] its multiple agents to inspect and re-inspect TPC's work . . . in a piecemeal, and uncoordinated manner in which SUCF and multiple inspection agents often measured TPC's work against subjective, non-contractual and moving standards" (Opp Mem at 18; see Sukalo Aff., ¶¶ 49-55). "This factual history certainly raises material issues of fact as to whether the delays TPC experienced in completing this work were the result of SUCF's gross negligence or deliberate misconduct" (Opp Mem at 18).
"Similarly, there is ample evidence that SUCF and its agents were grossly negligent and engaged in deliberate misconduct in impeding TPC completion of final inspections, commissioning of equipment and the personnel training required by the contract" (id.). TPC relies on evidence that some inspections were cancelled the last minute, impediments from other contractors, the lack of a telephone line, changing closeout demands and numerous inspections (see Sukalo Aff., ¶¶ 56-63; see also LaFraugh Aff., ¶ 47 ["The aggravated design delays distracted SUCF's and TPC's personnel from planning and executing the completion work, namely the punchlist, commissioning and training work."]).
The Court concludes that the proof adduced by TPC fails to raise a triable issue of fact concerning any exception to enforcement of the NDD clause. TPC was on notice that all of its work would be subject to "inspection, examination and testing" by the Fund and its consultants "at all times during the performance of the work and all at places where the work is carried on" (Contract, § 2.17 [1]; see id., § 2.23 [2]; Feltman Aff., ¶ 175). Thus, any delays in the inspection and RCL process attributable to maladministration were within TPC's contemplation when it entered into the Contract.
Moreover, while LaFraugh attempts to draw a connection between the initial design issues and end-of-project delays, claiming that "[t]he aggravated design delays distracted SUCF's and TPC's personnel from planning and executing the completion work" (LaFraugh Aff., ¶ 47), his expert report lacks support for this highly-implausible proposition. After all, the Contract was awarded in mid-2012 and these delays did not even begin until about five years later.
Finally, TPC has failed to demonstrate that the various delays associated with inspections, punch lists, commissioning, training and the like were the product of the Fund's [*23]intentional or quasi-intentional misconduct. The sources of delay identified by TPC — delayed inspections, multiple inspections, items being added to the RCL and requiring reinspection, commissioning delays and the training availability of Campus personnel — amount to no more than routine maladministration and lack of coordination, which was within TPC's contemplation in entering into the Contract. There simply is no evidence of conduct on the part of the Fund or its agents that amounts to intentional wrongdoing directed at TPC.
CONCLUSION
Accordingly, it is
ORDERED that the Fund's motion for summary judgment is granted to the extent of dismissing all of TPC's claims for delay damages, except for the claim alleging basement conduit routing delays caused by deficiencies in the initial design documents; and it is further
ORDERED that the movants in Motions #5 and #6 may file a supplemental brief of no more than ten (10) pages regarding the impact of this Decision & Order on the pending motion(s) by December 23, 2025, and the non-movants may respond with a supplemental brief of no more than ten (10) pages by January 16, 2026, which shall be the new return date for the pending motions.
This constitutes the Decision & Order of the Court, the original of which is being uploaded to NYSCEF for entry by the Albany County Clerk. Upon such entry, counsel for SUCF shall promptly serve notice of entry on all parties entitled to such notice.
Dated: December 1, 2025
Albany, New York
RICHARD M. PLATKIN
A.J.S.C.
Papers Considered:
NYSCEF Doc Nos. 2, 130-212, 325-435, 454-471, 476-503.

Footnotes

Footnote 1:Given the interrelationship between and among the motions, the Court has exercised its discretion to defer consideration of Ennead and Delphi's motions pending resolution of the Fund's motion and an opportunity for supplemental briefing.

Footnote 2:"Contract Documents" refers to the Contract, specifications, drawings, addenda issued prior to the opening of bids and change orders issued after the award of the Contract (see Contract, § 1.01).

Footnote 3:The Court has combined several of LaFraugh's categories where the factual and legal issues are essentially the same.

Footnote 4:SUCF also submits proof that certain of the shop drawings submitted by TPC and its steel subcontractor, Samuel Grossi & Sons, Inc. ("Grossi"), "were either incomplete and/or failed to make corrections that had been noted in prior submittals" (Feltman Aff., ¶¶ 54-55; see NYSCEF Doc No. 141). And after Grossi "refused to [perform] the [steel] erection," TPC hired a replacement subcontractor in December 2013, but terminated the new steel subcontractor for lack of insurance in September 2014 (see id., ¶ 56).

Footnote 5:General Requirements Section 010001.0, Section C 34 advised TPC of the potential for exploratory demolition and that such costs "shall be paid for as a Field Order" (NYSCEF Doc No. 138 at 30-31). 

Footnote 6:More specifically, FO #40 directed fire suppression modifications to the BSB pursuant to Bulletin #118, for which TPC was paid its direct costs of $53,094 (see Feltman Aff., ¶¶ 91-93; see also NYSCEF Doc Nos. 157-158). FO #55 was issued after the Fund determined that a second fire control panel was required in the BSB lobby "to alleviate the burden and expense on TPC to provide a fire watch" during the switchover period, and TPC was paid the direct costs of $41,719 (see Feltman Aff., ¶¶ 105-106; see also NYSCEF Doc Nos. 163-164). FOs 73 and 95 directed the installation of certain fire-rated partitions in the BSB and a shaft wall enclosure in the lobby (see Feltman Aff., ¶ 135). They were issued in response to bulletins from Ennead intended to address gaps in fire-rated walls (see id., ¶¶ 130-132; see also NYSCEF Doc Nos. 172-173 [bulletins] & 175-176 [FOs]). The Fund observes that Section 2.14 contemplated the unforeseen conditions discovered during demolition (see Feltman Aff., ¶¶ 133-134; see also Contract, § 2.14 [TPC's acknowledgment that the contract price covers "any unforeseeable obstacles or difficulties which it may encounter in the performance of the work"]). FO #122 was issued following some uncertainty as to whether certain limestone panels would be properly supported (see Feltman Aff., ¶¶ 98-101). Under FO #122, TPC received $10,951 for its direct costs in providing the steel and lintels directed by Ennead in RFI 534 (see id., ¶ 101; see also NYSCF Doc Nos. 161-162). FO #78 directed TPC to use cementitious fill to support the terrazzo base of the lobby and paid the direct costs of $8,828 following a request for clarification initiated by TPC (see Feltman Aff., ¶ 140; see also NYSCEF Doc Nos. 178-179).

Footnote 7:According to the Fund, the Ennead email was a humorous reply to a colleague who was without electricity due to Superstorm Sandy, who referred to wearing winter clothes in his office and joked that he might need to start a bonfire to stay warm (see NYSCEF Doc No. 454, ¶ 25).

Footnote 8:The Court is satisfied that an owner's knowing decision to proceed to bid with an incomplete and defective design and conceal that decision from bidders may fall within the NDD exceptions for uncontemplated delays, breach of a fundamental obligation and quasi-intentional misconduct, insofar as that conduct is shown to have been the cause of delays (see CGM Constr., Inc. v Sydor, 144 AD3d 1434, 1436-1437 [3d Dept 2016]; Castagna, 173 AD2d at 405-406). 

Footnote 9:By that time, the Fund had been denied its right to (i) question LaFraugh regarding the professional methodology, if any, supporting his genesis theory, and (ii) rebut the genesis theory through the opinions of its own experts (see Reply at 4-6; Commercial Division Rule 13 [c]). In the Court's view, the lack of proper disclosure was highly prejudicial to the Fund.

Footnote 10:To be sure, the Fund denies the claim of concealment and challenges LaFraugh's claim that TPC was "not informed of [Ennead's] plan to issue numerous Bulletins revising the Bid drawings" (LaFraugh Aff., ¶ 21; see id., ¶¶ 15-16, 18-20, 25). According to the Fund, TPC was "given advance notice that several bulletins concerning design issues would be issued before the Contract was executed on August 30, 2012" (Reply at 6). Specifically, at a June 25, 2012 pre-award meeting, "it was discussed that any clarifications of the design would be issued 'as sketches in forthcoming Bulletins.' Notably, at this meeting, TPC was again provided an opportunity to ask any questions it may have had about the design documents and TPC 'stated that they had none'" (NYSCEF Doc No. 454 ¶ 16; see NYSCEF Doc No. 458 ["All agreed that the Conformance Set should include no new information. If new clarifying details are needed they will be issued as sketches in forthcoming Bulletins."]). "The record is clear that there was no effort by SUCF to conceal from TPC that design clarifications would be issued through bulletins. TPC's claim that SUCF intentionally or deliberately failed to disclose that design changes would be made before it signed the Contract is without merit" (Reply at 7).

Footnote 11:As the Fund observes, LaFraugh "does not attribute any specific length of delay to any [particular] events" (Feltman Aff., n 2).

Footnote 12:In any event, LaFraugh's conclusory and unsupported attestation that all of the design defects were caused by omissions and deficiencies in the initial design documents is insufficient to raise a triable issue of fact.

Footnote 13:Although Revision 1 to Bulletin #66 was issued in July 2014, TPC did not submit a cost proposal for the additional conduit work until October 2015, more than one year later (see Feltman Aff., ¶ 74). That proposal resulted in the issuance of OCO #23, which provided TPC with compensation for its direct costs (see id., ¶¶ 75-76; NYSCEF Doc No. 151).

Footnote 14:Even in his affirmation in opposition, LaFraugh does not specifically attribute the delay to a defective or incomplete design; he refers only to a "rush[] to bid" (LaFraugh Aff., ¶ 46). 

Footnote 15:Insofar as TPC maintains that the Project schedule gave the Fund "significant time in which to coordinate and plan [the] work with" the Campus (Sukalo Aff., ¶ 30), that applies with the same force to TPC.